*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

MITSUBISHI POWER AMERICAS, INC.,

fka Mitsubishi Hitachi Power Systems Americas, Inc.,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

*Appeal from the United States Court of International Trade in Case Nos. 1:21-cv-00573-JAR, 1:22-cv-00102-JAR, 1:22-cv-00280-JAR and 1:23-cv-00271-JAR · Judge Jane A. Restani*

## APPELLANT'S OPENING BRIEF

Eric Rock, Esq.
Serhiy Kiyasov, Esq.
**Rock Trade Law LLC**
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
Telephone: (312) 824-6190
erock@rocktradelaw.com
skiyasov@rocktradelaw.com

*Attorneys for Appellant,*
*Mitsubishi Power Americas, Inc.*

September 12, 2025

 

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-1828 |
| **Short Case Caption** | Mitsubishi Power Americas, Inc. v. US |
| **Filing Party/Entity** | Mitsubishi Power Americas, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/16/2025

Signature: /s/ Serhiy Kiyasov

Name: Serhiy Kiyasov

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Mitsubishi Power Americas, Inc. | | Mitsubishi Heavy Industries Americas, Inc. |
| | | Mitsubishi Heavy Industries, Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Thomas Michael Keating<br>Rock Trade Law LLC<br>134 North LaSalle Street, Suite 1800, Chicago, IL 60602<br>(appeared in the originating court) | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................................i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES .............................................................................iv

STATEMENT OF RELATED CASES....................................................................1

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES..............................................................................2

STATEMENT OF THE CASE................................................................................2

    I.      Description of Merchandise ...................................................................2

    II.    Procedural History...............................................................................5

SUMMARY OF THE ARGUMENT ....................................................................15

ARGUMENT .........................................................................................................17

    I.      The Government Must Be Equitably Estopped from Denying
          the Application of Exclusions from China Section 301 Duties
          to the Supported Catalysts...................................................................17

          A.     The USCIT clearly erred in finding that a
                misrepresentation did not occur because the USTR and
                CBP granted Mitsubishi's China Section 301 exclusions
                and then refused to apply the exclusions granted .....................19

          B.     Mitsubishi reasonably relied on USTR's letters granting
                China Section 301 tariff exclusions because the
                Government, through the USTR and CBP, had authority
                to both issue exclusions and apply them to the Supported
                Catalysts upon their importation...............................................39

          C.     Based on the USTR letters, Mitsubishi imported
                Supported Catalysts to its detriment, being forced to pay
                tens of millions of dollars in unanticipated China
                Section 301 tariffs ....................................................................45

D.     The Government's refusal to honor the exclusions it granted to Mitsubishi is affirmative misconduct ......................46

II.     This Court Should Ignore Other Considerations Referenced by the USCIT.............................................................................51

III.     Alternatively, This Court Must Enforce the USCIT's Finding That Supported Catalyst Plates Qualify for Exclusions from China Section 301 Tariffs ..................................................................53

IV.     Supported Catalysts Imported in Block Form are Properly Classified Under Heading 3815, HTSUS............................................56

CONCLUSION ..........................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Elec. Lab'ys, Inc. v. United States*,
   774 F.2d 1110 (Fed. Cir. 1985) ......................................................48, 49, 50, 51

*Avenues In Leather, Inc. v. United States*,
   423 F.3d 1326 (Fed. Cir. 2005) ........................................................58

*Avocados Plus Inc. v. Veneman*,
   370 F.3d 1243 (D.C. Cir. 2004) .........................................................52

*Brewster v. City of Los Angeles*,
   672 F. Supp. 3d 872 (C.D. Cal. 2023) ......................................................48, 50

*California-Pac. Utilities Co. v. United States*,
   194 Ct. Cl. 703 (1971) ......................................................40

*Corniel-Rodriguez v. Immigr. & Naturalization Serv.*,
   532 F.2d 301 (2d Cir. 1976) ...............................................................17

*Crystal Clear Indus. v. United States*,
   843 F. Supp. 721 (Ct. Int'l Trade 1994),
   *aff'd*, 44 F.3d 1001 (Fed. Cir. 1995)................................................................31

*Fed. Crop Ins. Corp. v. Merrill*,
   332 U.S. 380 (1947).......................................................................40

*Fredericks v. C.I.R.*,
   126 F.3d 433 (3d Cir. 1997) ...............................................................*passim*

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
   467 U.S. 51 (1984).......................................................................*passim*

*Honeywell Int'l, Inc. v. United States*,
   756 F. Supp. 3d 1346 (Ct. Int'l Trade 2025)......................................................42

*ICCS USA Corp. v. United States*,
   952 F.3d 1325 (Fed. Cir. 2020) ........................................................18

*In re Section 301 Cases*,
   628 F. Supp. 3d 1235 (Ct. Int'l Trade 2023) ...............................................41-42

*Int'l Light Metals v. United States*,
   194 F.3d 1355 (Fed. Cir. 1999) ........................................................41

*JVC Co. of Am., Div. of US JVC Corp. v. United States,*
234 F.3d 1348 (Fed. Cir. 2000) ....................................................32, 33

*Kosakow v. New Rochelle Radiology Assocs., P.C.,*
274 F.3d 706 (2d Cir. 2001) ......................................................19, 22

*LeMans Corp. v. United States,*
660 F.3d 1311 (Fed. Cir. 2011) ........................................................57

*Masters Pharmaceutical, Inc. v. DEA,*
861 F.3d 206 (D.C. Cir. 2017) ....................................................18, 47

*Millenium Lumber Distrib. v. United States,*
558 F.3d 1326 (Fed. Cir. 2009) ........................................................57

*Off. of Pers. Mgmt. v. Richmond,*
496 U.S. 414 (1990).................................................................. 40-41

*Park B. Smith, Ltd. v. United States,*
347 F.3d 922 (Fed. Cir. 2003) ..........................................................58

*PDT Holdings, Inc. v. City of Dallas,*
712 S.W.3d 597 (Tex. 2025) ......................................................*passim*

*R. H. Stearns Co. v. United States,*
291 U.S. 54 (1934)............................................................................17

*Schwebel v. Crandall,*
967 F.3d 96 (2d Cir. 2020) ........................................................*passim*

*Shamrock Bldg. Materials, Inc. v. United States,*
119 F.4th 1346 (Fed. Cir. 2024) ..........................................18, 19, 42

*Swimways Corp. v. United States,*
329 F. Supp. 3d 1313 (Ct. Int'l Trade 2018) ....................................31

*United States v. Eisenberg,*
149 F. Supp. 3d 71 (D.D.C. 2015)....................................................40

*United States v. Ford Motor Co.,*
463 F.3d 1286 (Fed. Cir. 2006) ........................................................18

*Vassenelli v. the USCITy of Syracuse,*
138 A.D.3d 1471 (2016)...................................................................45

*Victoria's Secret Direct, LLC v. United States,*
769 F.3d 1102 (Fed. Cir. 2014) ........................................................57

*Zacharin v. United States*,
213 F.3d 1366 (Fed. Cir. 2000) .........................................................18


**Statutes & Other Authorities:**

19 U.S.C. § 1500(b). ..............................................................................42

19 U.S.C. § 2411(a)(1)..............................................................................5

19 U.S.C. §§ 2411-20......................................................................41, 43

28 U.S.C. § 1295(a)(5)...............................................................................1

28 U.S.C. § 1581(a) .....................................................................1, 18, 52

28 U.S.C. § 2636(a)(1)...............................................................................1

Fed. Cir. R. 47.5 .......................................................................................1

*CSMS # 64384423 - UPDATED GUIDANCE: Import Duties on Imports of Steel and Steel Derivative Products* (U.S. Customs & Border Prot. Mar. 17, 2025), https://content.govdelivery.com/bulletins/ gd/USDHSCBP-3d66da7?wgt_ref=USD HSCBP_WIDGET_2...................... 53, 54-55

*CSMS # 64384496 - UPDATED GUIDANCE: Import Duties on Imports of Aluminum and Aluminum Derivative Products* (U.S. Customs & Border Prot. Mar. 17, 2025)............................................................................54

Exec. Order No. 10,908, 90 Fed. Reg. 14,705 (Mar. 26, 2025) .............55

Exec. Order No. 10,962, 90 Fed. Reg. 37,727 (July 30, 2025) ..............55

Exec. Order No. 14,289, 90 Fed. Reg. 18,907 (Apr. 29, 2025)...............55

*Extension of Exclusions and Request for Comments: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 88 Fed. Reg. 90,225 (Dec. 29, 2023)........................11

Harmonized Tariff Schedule, General Rules of Interpretation 5(b)...........31, 32, 63

Harmonized Tariff Schedule of the United States

HQ H334008 (U.S. Customs & Border Prot. Feb. 14, 2025), https://rulings.cbp.gov/ruling/H334008...............................................42

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (Aug. 24, 2017) ..............................................................5

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Targeting of the Semiconductor Industry for Dominance*, 89 Fed. Reg. 106,725 (Dec. 30, 2024) ..................................................................... 53-54

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (Apr. 6, 2018) ..............................................................................5

*Notice of Extension for Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 88 Fed. Reg. 62,423 (Sept. 11, 2023)..............................................11

*Notice of Extension of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 89 Fed. Reg. 46,948 (May 30, 2024) ................................. 11-12, 41

*Notice of Extensions for Reinstated Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 78,187 (Dec. 21, 2022) ......................11

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*, 83 Fed. Reg. 47,974 (Sept. 21, 2018)....................................5, 41, 43

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459 (May 9, 2019) ..................................................5

*Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 48,600 (Aug. 11, 2020)..............................................10

*Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 90 Fed. Reg. 42,500 (Sept. 2, 2025)..............................................41

*Notice of Product Exclusions: China's Acts, Policies, and Practices
Related to Technology Transfer, Intellectual Property, and Innovation*,
85 Fed. Reg. 27,489 (May 8, 2020) .................................................................10

*Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and
Practices Related to Technology Transfer, Intellectual Property, and
Innovation*, 87 Fed. Reg. 17,380 (Mar. 28, 2022) .............................................11

*Procedures for Requests To Exclude Particular Products From the
September 2018 Action Pursuant to Section 301: China's Acts,
Policies, and Practices Related to Technology Transfer, Intellectual
Property, and Innovation*, 84 Fed. Reg. 29,576 (June 24, 2019) ...............*passim*

*Procedures To Consider Requests for Exclusion of Particular Products
From the Determination of Action Pursuant to Section 301*,
83 Fed. Reg. 32,181 .........................................................................................37

*Public Docket: Index and Status of Requests for
Exclusion from $200 Billion Trade Action (List 3)*, USTR,
https://comments.ustr.gov/s/docket?docketNumber=USTR-2019-
0005.......................................................................................................9, 27, 28, 34

Restatement (Second) of Torts § 894........................................................................19

*Section 301 Exclusion Request Process: Filing Guidelines
for Product-Specific Exclusion Requests*, USTR,
https://ustr.gov/sites/default/files/enforcement/301Investigations/
Section%20301%20Exclusion%20Request%20Guidelines.pdf
(last visited September 10, 2025) ..............................................................*passim*

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, no other appeal in this civil action has been filed before this or any other appellate court. The following cases in the United States Court of International Trade ("USCIT") will be affected by the Court's decision in this matter: 22-00102, 22-00280, and 23-00271, which were suspended pending the outcome of 21-00573 being appealed herein.

## STATEMENT OF JURISDICTION

Appellant Mitsubishi Power Americas, Inc. (hereinafter, Appellant or Mitsubishi) seeks review of the final judgment issued by the USCIT on April 29, 2025, denying both Appellant's and Appellee United States' motions for summary judgment and declaring the classification other than as claimed by the parties and denying the applicability of China Section 301 tariff exclusions to the subject merchandise. On May 29, 2025, Appellant timely appealed the final judgment to this Court, which has exclusive jurisdiction over an appeal from the USCIT. 28 U.S.C. § 1295(a)(5). The USCIT had subject matter jurisdiction over the case being appealed because United States Customs and Border Protection ("CBP") denied Appellant's protests regarding classification under the Harmonized Tariff Schedule of the United States ("HTSUS") and applicability of China Section 301 tariff exclusions; additionally, Appellant timely filed a summons and complaint in the USCIT challenging denied protests. See 28 U.S.C. § 1581(a); 28 U.S.C. § 2636(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the USCIT erred by concluding that the doctrine of equitable estoppel did not prevent the government from denying the application of China Section 301 tariff exclusions to supported catalysts imported in block form.

2.      Alternatively, whether the USCIT erred by not applying China Section 301 tariff exclusions to catalyst plates alone.

3.      Alternatively, whether the USCIT erred by classifying the subject merchandise under heading 8421, HTSUS, and not heading 3815, HTSUS.

## STATEMENT OF THE CASE

### I.      Description of Merchandise

This appeal concerns the applicability of China Section 301 tariff exclusions to supported Selective Catalytic Reduction ("SCR") catalysts imported in block form (hereinafter, Supported Catalysts or Subject Merchandise). Mitsubishi contends that the subject Supported Catalysts imported in block form are appropriately classified as "[r]eaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included" of heading 3815, HTSUS, and, specifically, as "other [s]upported catalysts" of subheading 3815.19.0000, HTSUS. Appx0001-0002; Appx0094. Appellee contends that the subject Supported Catalysts imported in block form are classified as "… filtering or purifying machinery and apparatus for … gases; parts thereof" under heading 8421, HTSUS. Appx1067.

Regardless of the classification, Mitsubishi contends that the government must be equitably estopped from denying the applicability of the tariff exclusions that were explicitly granted by the United States Trade Representative ("USTR") and CBP (collectively referred to as the "Government") to Mitsubishi for the subject Supported Catalysts imported in block form. Appx2280; Appx2313-2317.

The subject Supported Catalysts imported in block form are depicted below:



Appx0174. Supported Catalysts imported in block form are comprised of approximately sixteen individual Catalyst Units. Appx0003; Appx0125. Each Catalyst Unit is, in turn, comprised of approximately eighty individual Catalyst Plates (or Catalyst Elements). Appx0003; Appx0125. Catalyst Plates are assembled into Catalyst Units, which are further assembled into Supported Catalysts imported in block form using a steel block frame and other miscellaneous components such

as a protector, a set of seal bars, spacers, and a seal plate. Appx0125. Each imported Supported Catalysts' block consists of approximately 1,300 Catalyst Plates, which make up the overwhelming majority of the block by weight and value and impart the article's functionality. Appx2278.

Supported Catalysts are installed in the SCR Reactor, which is, in turn, installed in the SCR System, which is then installed in the Air Quality Control System ("AQCS") at coal burning power plants. Appx0087. Supported Catalysts perform the SCR catalyst function as part of a complete SCR System. Appx0087.

The only function of Supported Catalysts is to promote or facilitate a chemical reaction, returning to their original form after completion of the target reaction. Appx0087. Specifically, Supported Catalysts promote the reaction of ammonia with nitrogen oxides (NO and $NO_2$, collectively referred to as NOx) in the presence of oxygen. Appx0087. SCR technology utilizes a catalyst to promote a reduction reaction that chemically converts NOx into nitrogen and water. Appx0087. Thus, the reaction that occurs in Supported Catalysts is simply a conversion reaction referred to as "redox" or "oxidation-reduction" reaction, in which the NOx is said to have been reduced where the ammonia acts as the reducing agent, or reductant. Appx0087. The NOx molecule is simply converted to other molecules (nitrogen and water) while remaining in the flue gas. Appx2278.

II.     <u>Procedural History</u>

In 2017-2019, pursuant to Section 301 of the Trade Act of 1974 (as amended, 19 U.S.C. § 2411(a)(1)), the USTR took various actions which culminated in the imposition of an additional 25 percent *ad valorem* duty on various products imported from China (China Section 301 tariffs). *See Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (Aug. 24, 2017); *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*, 83 Fed. Reg. 47,974, 47,974 (Sept. 21, 2018) (giving notice of List 3 action and imposition of 10 percent duties on List 3 articles as of September 24, 2018); *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459, 20,459 (May 9, 2019) (announcing that duties on List 3 articles would be increased to 25 percent beginning May 10, 2019). This 10, and subsequently 25, percent *ad valorem* duty applied to articles classified under subheading 3815.19.00, HTSUS, which originated in China.

Following the imposition of the additional 10, and subsequently 25, percent *ad valorem* duty, the USTR established a process by which importers could request that specific products classified within an affected tariff provision be excluded from—that is, imported without application of—such duties. *See Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576, 29,576-82 (June 24, 2019).

According to the exclusion request process, applicants seeking a product-specific exclusion were required to register on the USTR's website and submit a completed request form. *Id.* Each product required its own separate form. *See id.* Applicants were instructed to provide the following information:

- The applicant's (or third party's) contact information;

- The applicant's relationship to the product (such as importer or producer);

- The 10-digit HTSUS subheading applicable to the product (unless unavailable, in which case the 8-digit subheading needed to be provided);

- The name of the product;

- A detailed description of the product (including physical characteristics);

- The product's function, application, principal use, and any distinguishing physical features (including supporting documents);

- The applicant's gross revenues (for 2018 and the first quarter of 2019); and

- For imports sold as final products, the percentage of the applicant's total gross sales that sales of the Chinese-origin product accounted for (in 2018).

*Id.* The USTR also requested that applicants provide information surrounding their rationales in favor of applying the exclusions, such as whether the products are only available from China, whether the products are available in the United States or third countries, and whether the additional duties will cause severe harm to the applicant or U.S. interests. *Id.*

In addition to the requirements set forth in the Federal Register, the USTR released a set of guidelines for submitting Section 301 exclusion applications on its website. *Section 301 Exclusion Request Process: Filing Guidelines for Product-Specific Exclusion Requests*, USTR, https://ustr.gov/sites/default/files/enforcement/ 301Investigations/Section%20301%20Exclusion%20Request%20Guidelines.pdf ("Guidelines"). In these Guidelines, the USTR specified that products must be "administrable" to be candidates for exclusion requests. *Id.* CBP reviewed each exclusion request for administrability:

A product-specific exclusion request will be considered administrable only if the product description enables **U.S. Customs and Border Protection (CBP) to consistently identify and correctly classify the covered product at time of entry**. Therefore, requests should include

detailed physical descriptions of the product, avoid ambiguous terms or clauses, and avoid descriptors that CBP cannot reasonably verify. Requests should also include an accurate reference to the 10-digit HTSUS subheading in which the product is classified.

*Id.* (Emphasis added)*.* As such, it follows that CBP confirmed both the description and classification of products for which exclusions were granted. The Guidelines reiterate that product exclusion requests should contain details such as a physical description of the product, unique physical features, and relationship to other articles, if applicable. *Id.*

On September 27, 2019, pursuant to the Section 301 exclusion process, Mitsubishi applied for two exclusions for two types of Supported Catalysts: TRAC and CM. The TRAC-type Supported Catalysts were described by Mitsubishi as follows:

**TRAC Type**: Plate-type DeNOx supported catalysts with enhanced mercury oxidation also known as Multi-function Denitrification Reaction Accelerator Catalyst comprised of a composition containing oxides of titanium (Ti), molybdenum (Mo) and/or tungsten (W), vanadium (V), and phosphorus (P) that is applied to a stainless steel mesh. **The product is imported in block module form** 75" W x 40" D x 43-79" H & contains 68-83 catalyst elements.

Appx1025-1026 (emphasis added). Similarly, Mitsubishi described its CM-type Supported Catalysts as follows:

**CM Type**: Plate-type DeNOx supported catalysts also known as Denitrification Reaction Accelerator Catalyst containing active compounds of molybdenum, tungsten, vanadium, etc. on a titanium dioxide based ceramic material that is applied to a stainless steel mesh. **The product is imported in block module form** for use in the

8

Selective Catalytic Reduction (SCR) process. Each block module is approximately 75" W x 40"D x 43 to 79"H & contains 16 catalyst units.

Appx1014 (emphasis added). Both exclusion applications also indicated the applicable classification as 3815190000, HSTUS. Appx1013; Appx1025.

In response to these applications, and following CBP's review of descriptions and classifications, the USTR issued two letters granting Mitsubishi's exclusion requests. Appx1023; Appx1035. Both letters contained the following language:

> I am pleased to notify you that **the United States Trade Representative has determined to grant the above-referenced exclusion request** submitted pursuant to the notice published at 84 FR 29576 ('the June 24 notice') . . . . An exclusion in response to your request has been granted by excluding from the additional tariffs products covered by a specially drafted description contained in the annex to the exclusion notice.

Appx1023; Appx1035 (emphasis added). Following the USTR's and CBP's determinations, the USTR website was updated to reflect that Mitsubishi's exclusion requests were granted:



*Public Docket: Index and Status of Requests for Exclusion from $200 Billion Trade Action (List 3)*, USTR, https://comments.ustr.gov/s/docket?docketNumber=USTR-2019-0005.

The requests also resulted in the following exclusion language provided for under heading 9903.88.46, HTSUS, and described in U.S. Notes 20(yy)(19) and 20(yy)(20) to Subchapter III of Chapter 99, HTSUS, for the period from September 24, 2018, to August 7, 2020, as follows:

(19) "Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx) with enhanced mercury oxidation, with oxides of base metals being the active substances, applied to a stainless steel mesh (described in statistical reporting number 3815.19.0000)."

(20) "Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx), with base metals being the active substances, applied on a titanium dioxide based ceramic material to a stainless steel mesh (described in statistical reporting number 3815.19.0000).

*Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 27,489, 27,493 (May 8, 2020) (hereinafter "Exclusion Notice"). These exclusions were subsequently extended through December 31, 2020, under heading 9903.88.56, HTSUS, and described in U.S. Notes 20(iii)(47) and 20(iii)(48), respectively, to Subchapter III of Chapter 99, HTSUS. *See Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 85 Fed. Reg. 48,600, 48,604 (Aug. 11, 2020) (hereinafter "Exclusion Extension Notice").

Both exclusions identified above were specifically applied for by Mitsubishi and issued to Mitsubishi by the USTR and CBP for Supported Catalysts imported in block form. Appx0091; Appx1023; Appx1035. Notably, both exclusions identified above and granted to Mitsubishi have been consistently extended by the USTR in the past several years and were last extended through June 14, 2024. *See Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17,380 (Mar. 28, 2022) (extending the catalysts' Section 301 exclusions from October 12, 2021, thru Dec 31, 2022); *Notice of Extensions for Reinstated Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 78,187 (Dec. 21, 2022) (extending the catalysts' Section 301 exclusions from January 1, 2023, thru September 30, 2023); *Notice of Extension for Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 88 Fed. Reg. 62,423 (Sept. 11, 2023) (extending the catalysts' Section 301 exclusions from October 1, 2023, thru December 31, 2023); *Extension of Exclusions and Request for Comments: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 88 Fed. Reg. 90,225 (Dec. 29, 2023) (extending the catalysts' Section 301 exclusions from January 1, 2024, thru May 31, 2024); *Notice of Extension of Certain Exclusions: China's Acts, Policies, and*

*Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 89 Fed. Reg. 46,948 (May 30, 2024) (extending the catalysts' Section 301 exclusions May 31, 2024, thru June 14, 2024).

Mitsubishi imported Supported Catalysts in block form subject to this appeal, which originated in China, into the United States from July 2018 through September 2020. Appx0002; Appx0089. They were entered under HTSUS subheading 3815.19.0000, duty- and tariff-free. Appx0089. On various dates from September 2019 through February 2021, CBP liquidated all entries of Supported Catalysts with duty rate increases of 25% *ad valorem* as a result of reclassification under subheading 8421.39.4000, HTSUS, a subheading which is subject to China Section 301 tariffs. Appx0002; Appx0089. Most importantly, at liquidation, CBP refused to apply China Section 301 tariff exclusions described above to Supported Catalysts, the same exclusions CBP reviewed and granted to Mitsubishi together with the USTR. Appx2309. Mitsubishi subsequently filed timely protests within one hundred and eighty (180) days of the final liquidation of each of the underlying entries. Appx0002; Appx0089. CBP denied Mitsubishi's protests. Appx0002; Appx0089.

On October 29, 2021, Mitsubishi filed this action against the Government in the USCIT. Appx0002; Appx0051-0066. Mitsubishi's position, as discussed in its protest to CBP and subsequent pleadings in the USCIT, is that Supported Catalysts imported in block form are properly classified under subheading 3815.19.00,

HSTUS, as "supported catalysts" because they facilitate chemical conversion reactions and neither filter nor purify. However, regardless of the classification, the Government must be equitably estopped from denying the application of China Section 301 tariff exclusions to Supported Catalysts imported in block form, exclusions that were specifically applied for and granted to Mitsubishi by the Government. Appx0002; Appx0087-0088; Appx0113. In contrast, the Government argued that Supported Catalysts should be classified under subheading 8421.39.80, HTSUS, as gas filtering or purifying machinery and apparatus; the USCIT rejected this argument. Appx0013-0014.

On April 29, 2025, the USCIT denied both Mitubishi's motion for summary judgment and the Government's cross-motion for summary judgment. Appx0018-0019. The USCIT found that Supported Catalysts imported in block form were properly classified under subheading 8421.99.00, HTSUS, as parts of gas filtering or purifying machinery. Additionally, the USCIT found that equitable estoppel did not apply because "[t]he government did not mislead plaintiff" by initially granting Mitsubishi's exclusion requests and denying application of exclusions at liquidation. Appx0018. The USCIT reasoned "that Mitsubishi was on notice that its request was only partially granted and that its products were not covered by the language of the exclusions drafted by the USTR." Appx0017-0018. Finally, the USCIT found that "Supported [C]atalysts on a mesh plate [i.e., catalyst plates] may be excluded from

301 duties, but the product at issue is more than that." Appx0018. However, the USCIT failed to enforce its finding and failed to instruct CBP to reliquidate entries of the Supported Catalysts imported in block form with a refund of China Section 301 duties as applied, at a minimum, to catalyst plates. Mitsubishi timely filed this appeal. Appx0029.

Regardless of the classification, Mitsubishi appeals the USCIT's clearly erroneous factual findings that Mitsubishi was on notice that its request was only partially granted, that its products were not covered by the language of the exclusions drafted by the USTR, and that the Government did not mislead Mitsubishi, which resulted in the USCIT's clearly erroneous denial of equitable estoppel against the Government.

In the alternative, Mitsubishi appeals the USCIT's failure to enforce USCIT's own finding that China Section 301 tariff exclusions apply to, at a minimum, catalyst plates, that comprise the overwhelming majority—by weight, cost, value, quantity, or any other measurable metric—of the Supported Catalysts imported in block form.

Finally, should this Court reach classification analysis, Mitsubishi maintains that the subject Supported Catalysts imported in block form are properly classified under heading 3815, HTSUS, as "[r]eaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included," and, more specifically,

as "other … **supported catalysts**" of subheading 3815.19.00, HTSUS, which further confirms the applicability of the exclusions.

## SUMMARY OF THE ARGUMENT

This Court should reverse USCIT's clearly erroneous finding that the Government is not equitably estopped from denying the application of China Section 301 tariff exclusions to the subject Supported Catalysts imported in block form. Specifically, the Government (CBP and USTR) misrepresented the original grant of the exclusions to Mitsubishi when CBP and USTR approved Mitsubishi's exclusion requests and issued letters to Mitsubishi granting such exclusions and denied honoring Mitsubishi's exclusions at liquidation. As a result, Mitsubishi relied on the Government's misrepresentations to its detriment, suffering a loss of tens of millions of dollars that the Government assured it would not have to pay. Moreover, the resulting tens of millions of dollars that Mitsubishi had to pay in China Section 301 tariffs, coupled with the Government's affirmative misrepresentations, caused an egregiously unfair result and constitute affirmative misconduct on behalf of the Government. As explained more fully below, the USCIT clearly erred when it found that Mitsubishi was on notice that its requests were only partially granted, that its products were not covered by the language of the exclusions drafted by the USTR, and that the Government did not mislead Mitsubishi.

Alternatively, if this Court finds that the resulting exclusion language does not cover Supported Catalysts imported in block form, this Court should enforce the USCIT's finding that "Supported [C]atalysts on a mesh plate may be excluded from 301 duties." Appx0018. Even though the USCIT agreed that the language of the exclusions covers catalyst plates, the USCIT did not enforce its findings. Because the USCIT found that China Section 301 tariff exclusions apply to, at a minimum, catalyst plates, that comprise the overwhelming majority—by weight, cost, value, quantity, or any other measurable metric—of the Supported Catalysts imported in block form, and because partial tariff applicability has been consistently adopted by various U.S. administrations, this Court should order reliquidation of the subject entries with the refund of China Section 301 tariffs applied to, at a minimum, catalyst plates contained within Supported Catalysts' blocks.

Finally, should this Court reach the classification analysis, Supported Catalysts imported in block form cannot be classified under heading 8421, HTSUS, because they do not filter or purify flue gas and they are not "parts" of filtering or purifying machinery or apparatus for gases. Rather, Supported Catalysts imported in block form are properly classified as "supported catalysts" of heading 3815, HTSUS.

**ARGUMENT**

I.   <u>The Government Must Be Equitably Estopped from Denying the Application of Exclusions from China Section 301 Duties to the Supported Catalysts.</u>

A "'fundamental and unquestioned' principle of our jurisprudence [is] that no one shall be permitted to . . . take advantage of his own wrong." *Schwebel v. Crandall*, 967 F.3d 96, 106 (2d Cir. 2020) (*citing Corniel-Rodriguez v. Immigr. & Naturalization Serv.*, 532 F.2d 301 (2d Cir. 1976)).[1] The Government is likewise bound by this fundamental principle. *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984); *see also Fredericks v. C.I.R.*, 126 F.3d 433 (3d Cir. 1997)[2].

To establish an equitable estoppel claim, the party seeking to assert it must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel. *See id*. at 59. When estoppel is asserted against the government, the party must also show that its actions amounted to "affirmative misconduct." *Id*.;

---

[1] Alteration in the original (*quoting R. H. Stearns Co. v. United States*, 291 U.S. 54, 61-62 (1934) (Cardozo, *J*.)).

[2] In *Heckler*, the United States Supreme Court explicitly stated that it was "hesitant" to find that estoppel could never apply to the government. 467 U.S. at 60. This reasoning acknowledges that Appellee cannot take advantage of private parties simply by being the government. In *Fredericks*, the United States Court of Appeals for the Third Circuit applied this principle and upheld the doctrine of "equitable estoppel" against Internal Revenue Service ("IRS") finding "affirmative misconduct" on behalf of the IRS. 126 F.3d at 451.

17

*see also Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000). As far as the "affirmative misconduct" element, there is no widely accepted test, but the United States Court of Appeals for the District of Columbia Circuit recently found establishing "affirmative misconduct" requires "a showing of misrepresentation or concealment, or, at least, behavior that will cause an egregiously unfair result." *Masters Pharmaceutical, Inc. v. DEA*, 861 F.3d 206, 225 (D.C. Cir. 2017) (internal citations omitted).

The USCIT only challenged the first element of equitable estoppel in its opinion, declining to find that the Government misled Mitsubishi, concluding that "Mitsubishi was on notice that its request was only partially granted and that its products were not covered by the language of the exclusions drafted by the USTR." Appx0017-0018.

The Federal Circuit reviews such factual findings for clear error in appeals filed under 28 U.S.C. § 1581(a). *Shamrock Bldg. Materials, Inc. v. United States*, 119 F.4th 1346, 1351 (Fed. Cir. 2024); *United States v. Ford Motor Co.*, 463 F.3d 1286, 1290 (Fed. Cir. 2006). This Court reviews questions of fact for clear error in cases appealed from the USCIT, while questions of law are reviewed *de novo*. *ICCS USA Corp. v. United States*, 952 F.3d 1325, 1331 (Fed. Cir. 2020). As shown more fully below, the USCIT's finding—that Mitsubishi was on notice that its request was only partially granted, that its products were not covered by the language of the

exclusions drafted by the USTR, and that the Government did not mislead Mitsubishi—are clearly erroneous factual findings and must be reversed. *See Shamrock Bldg. Materials, Inc.*, 119 F.4th at 1351.

The USCIT clearly erred in finding that equitable estoppel did not apply; as set forth more fully below, all elements are clearly satisfied. Mitsubishi respectfully requests that this Court reverse the USCIT's judgment as to equitable estoppel.

A.    <u>The USCIT clearly erred in finding that a misrepresentation did not occur because the USTR and CBP granted Mitsubishi's China Section 301 exclusions and then refused to apply the exclusions granted.</u>

When a party makes a false statement, he or she makes a misrepresentation; the party making the statement need not intend to deceive the plaintiff. *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 726 (2d Cir. 2001); Restatement (Second) of Torts at § 894.[3] Courts have long expressed a willingness to find that misrepresentations made by federal government agencies supported claims of equitable estoppel in order to prevent injustice against private parties. *Heckler*, 467 U.S. at 60 ("[W]e are hesitant . . . to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by . . . ***decency, honor, and reliability in their***

---

[3] Courts have also referred to misrepresentations in certain cases as "definite" or "material." *See Kosakow*, 274 F.3d at 726.

19

*dealings with their Government*.") (emphasis added); *see also Fredericks*, 126 F.3d at 438, 451.

Here, the Government, through the USTR and CBP, clearly made representations to Mitsubishi, ultimately refusing to honor them. The USTR letters granting exclusions are misrepresentations because, even though the letters granted Mitsubishi's requests—after CBP's review and confirmation of both the exclusion language and HTSUS codes—CBP refused to apply granted exclusions when it liquidated Mitsubishi's entries. Appx0018-0019 (denying Mitsubishi's Motion for Summary Judgment); Appx1023 (the Government granting Section 301 exclusion for CM-type Supported Catalysts); Appx1035 (the Government granting Section 301 exclusion for TRAC-type Supported Catalysts). The USCIT, thus, clearly erred because, despite acknowledging that the USTR's letters granted Mitsubishi's China Section 301 tariff exclusion requests, the USCIT also found that the resulting exclusions did not cover merchandise that was the subject of the approved exclusion requests. Appx0018-0019. On its face, such a finding shows that a misrepresentation indeed occurred.

Appellant's position is that the language of resulting exclusions is broader than what Mitsubishi described in its exclusion applications; however, assuming, *arguendo*, that the resulting exclusion language only covers part of the Subject Merchandise, the Government's misrepresentations are further highlighted because

the Government advised Mitsubishi that its requests were "granted," rather than "partially granted." In any event, the Government—through USTR letters issued after the USTR's and CBP's review of the exclusion requests—misrepresented the fact that the exclusions did not apply to the Supported Catalysts imported in block form, as evident in CBP's denial of the exclusions' applicability at liquidation. Moreover, because the USTR and CBP worked in concert to arrive at the determination as to whether the exclusions were to be granted, the representations made in the USTR letters were affirmative misrepresentations, rather than mere oversights.

Misrepresentations may take oral or written form and can be made through acts or omissions. *See, e.g.*, *Fredericks v. C.I.R.*, 126 F.3d 433, 440 (3d Cir. 1997)[4]. In *Fredericks*, the United States Court of Appeals for the Third Circuit found that the government was estopped from charging a taxpayer with an income tax deficiency assessment. *Id*. There, the court found that the government—through Internal Revenue Service ("IRS") agents—made statements to a taxpayer constituting misrepresentations; this was because, despite being in the IRS' possession years later, agents orally advised the taxpayer that the indefinite

---

[4] While certain cases cited herein originate in various federal and state courts and may be non-binding, they provide detailed and guiding analysis of the equitable estoppel doctrine as applied to the government following the U.S. Supreme Court's decision in *Heckler*.

extension form he submitted was not on file and "probably lost in the mail." *Id.* The court further determined that the occasions when the government induced the taxpayer to sign three limited extensions were misrepresentations that "went beyond mere erroneous oral advice from an IRS agent." *Id.* The government's silence after locating the indefinite extension form, coupled with its decision to rely on it and fail to notify the taxpayer of this decision, was likewise determined to be misleading. *Id.* A misrepresentation is therefore a statement, action, or omission that tends to deceive the recipient of that statement, whether or not the party making the statement intended for it to be deceptive. *See id.; see also Kosakow*, 274 F.3d at 726.

Further, a misrepresentation made by the government resulting from a lack of diligence supports a claim for equitable estoppel. *PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597, 604 (Tex. 2025). In *PDT Holdings, Inc.*, the Supreme Court of Texas ruled that a city was equitably estopped from enforcing a 26-foot building height limit ordinance against a builder. *Id.* In that case, the court declined to accept the city's argument that its approval of the builder's construction project was "an unintentional oversight"; rather, the court found that the intent behind its misrepresentations was immaterial and that false statements sufficiently supported the builder's equitable estoppel claim. *Id.* For example, in response to a stop-work order pursuant to the ordinance, the builder submitted a revised construction plan to account for a 36-foot—rather than a 26-foot—building height; the city, after

reinspection, issued a permit and lifted the stop-work order based on the height ordinance, designating the building as "OK TO FINISH." *Id.* The court commented that the misrepresentations were not "mere mistake[s]," but were affirmatively misleading because, in addition to approving the project, it issued a final stop-work order when the building was approximately 90 percent complete. *Id.* at 607. Thus, following the court's reasoning in *PDT Holdings, Inc.*, in order to fulfill the misrepresentation element for equitable estoppel, even if the statement was made in good faith, the reason why the government made the misrepresentation is immaterial.

Federal courts apply similar reasoning to allow private parties to overcome injustice perpetuated by the federal government. In *Schwebel*, 967 F.3d at 105, the plaintiff "prematurely" applied for a status adjustment application under the Child Status Protection Act, but the government failed to advise her or her attorney of this defect. The plaintiff was unable to resubmit the application because, once it was discovered that the government never processed her application or advised her of the problem, she was no longer considered a "child" under the statute, thus she could not apply for a status adjustment on that basis. *Id.* at 100-02. The United States Court of Appeals for the Second Circuit reasoned that the government's failure to send a rejection notice regarding plaintiff's status adjustment application illustrates a misrepresentation by omission because the government's "silence and inaction" for

an extended period of time "would reasonably suggest that the application was indeed being processed." *Id*. at 105. Since all the elements of equitable estoppel were met, the court affirmed the district court's ruling for plaintiff. *Id.* at 107.

Here, the USCIT stated that Mitsubishi was "on notice" that its requests were "partially granted"; this is plainly untrue. Appx0017. Mitsubishi applied for two separate exclusions for two types of Supported Catalysts imported in block form, TRAC and CM. The TRAC Supported Catalyst is described in Mitsubishi's exclusion application as follows:

> Plate-type DeNOx supported catalysts with enhanced mercury oxidation also known as Multi-function Denitrification Reaction Accelerator Catalyst comprised of a composition containing oxides of titanium (Ti), molybdenum (Mo) and/or tungsten (W), vanadium (V), and phosphorus (P) that is applied to a stainless steel mesh. **The product is imported in block module form** 75" W x 40" D x 43-79" H & contains 68-83 catalyst elements."

Appx1025-1026 (emphasis added). Mitsubishi's exclusion application also indicates that the described TRAC-type Supported Catalyst imported in block form was classified under subheading 3815.19.0000, HTSUS. Appx1025.

In response to the exclusion application for the TRAC-type Supported Catalyst imported in block form, the USTR published a letter on the USTR Comments Portal addressed to Mitsubishi, granting the exclusion:

> I am pleased to notify you that the United States Trade Representative has determined to **grant the above-referenced exclusion request** submitted pursuant to the notice published at 84 FR 29576 ('the June 24 notice') . . . . An exclusion **in response to your request has been**

**granted** by excluding from the additional tariffs products covered by a specially drafted description contained in the annex to the exclusion notice.

Appx1035 (emphasis added). This letter was a direct response to Mitsubishi's exclusion application for the TRAC-type Supported Catalyst imported in block form and was signed by the USTR's General Counsel at the time, Joseph Barloon. Appx1035. The USTR then proceeded to post the exclusion to the Federal Register. *See* Appx1035. The approval resulted in the following exclusion language for the TRAC-type formulation:

> Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx) with enhanced mercury oxidation, with oxides of base metals being the active substances, applied to a stainless steel mesh (described in statistical reporting number 3815.19.0000)." See 9903.88.46 and 9903.88.56, HTSUS.

Appx2308. The same procedure applied to the CM Supported Catalyst imported in block form, which is described in Mitsubishi's exclusion application as follows:

> Plate-type DeNOx supported catalysts also known as Denitrification Reaction Accelerator Catalyst containing active compounds of molybdenum, tungsten, vanadium, etc. on a titanium dioxide based ceramic material that is applied to a stainless steel mesh. **The product is imported in block module form** for use in the Selective Catalytic Reduction (SCR) process. Each block module is approximately 75" W x 40"D x 43 to 79"H & contains 16 catalyst units.

Appx1014 (emphasis added). Mitsubishi's exclusion application also indicates that the described CM-type Supported Catalyst imported in block form was classified under subheading 3815.19.0000, HTSUS. Appx1013. As with the TRAC-type

Supported Catalyst, the USTR letter granting the exclusion for the CM-type Supported Catalyst followed:

> I am pleased to notify you that the United States Trade Representative has determined to **grant the above-referenced exclusion request** submitted pursuant to the notice published at 84 FR 29576 ('the June 24 notice') . . . . An exclusion **in response to your request has been granted** by excluding from the additional tariffs products covered by a specially drafted description contained in the annex to the exclusion notice.

Appx1023 (emphasis added). This letter was a direct response to Mitsubishi's exclusion application for the CM-type Supported Catalyst imported in block form and was signed by the USTR's General Counsel at the time, Joseph Barloon. The USTR likewise posted this exclusion to the Federal Register. *See* Appx1023. The approval resulted in the following exclusion language for the CM-type formulation:

> Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx), with base metals being the active substances, applied on a titanium dioxide based ceramic material to a stainless steel mesh (described in statistical reporting number 3815.19.0000)." See 9903.88.46 and 9903.88.56, HTSUS.

Appx2308.

Contrary to the USCIT's finding, Mitsubishi maintains that the resulting exclusion language published in the Federal Register is broader than the descriptions offered by Mitsubishi in its exclusion applications. Mitsubishi requested exclusions for Supported Catalysts imported in block module form, but the resulting exclusion language described above does not limit the Supported Catalysts to be imported only

in block module form. Appx2308. In fact, the resulting exclusion language does not mention any form, composition, or packaging in which Subject Merchandise is to be imported at all. Appx2308. As such, the resulting exclusion language is broader than descriptions provided in Mitsubishi's exclusion applications because it does not have the limitation that Supported Catalysts are to be imported in block module form, and, thus, can be applied to the described Supported Catalyst that are imported in any form, composition, or packaging. Appx2308.

Moreover, as the USTR indicated in its letters, ***the Government, responsive to the applications, granted Mitsubishi's exclusion requests***. Appx1023; Appx1035. The USTR comments portal clearly indicates that exclusion requests were either "granted" or "denied." For instance, the USTR portal, when narrowed to Mitsubishi's exclusion requests, appears as follows:



*Public Docket: Index and Status of Requests for Exclusion from $200 Billion Trade Action (List 3)*, USTR, https://comments.ustr.gov/s/docket?docketNumber=USTR-2019-0005. As clearly shown, the "stage" status of both Mitsubishi's applications

reflects "Granted." *Id.* Other applications that were not granted simply reflect "Denied":



*Id.* The docket depicted above makes it clear that exclusion requests are either "granted" or "denied." Therefore, it was apparent to Mitsubishi—as it reasonably would have been to anyone—that exclusion requests are either fully "granted" or fully "denied" because there were no partial grants or denials on the docket. *Id.* Mitsubishi could not have been on notice that its exclusion requests were only partially granted because all of the Government's representations, whether indicated to the public or addressed to Mitsubishi directly, informed Mitsubishi that its exclusion requests *were*, indeed, granted in full. *See id.*; *see also* Appx1023; Appx1035.

This case bears similarities to *Fredericks* because, in both cases, the Government wrongly informed a private party that it is not eligible for a type of treatment, despite approving applications that were narrowly tailored for it. *See Fredericks*, 126 F.3d at 436 ("Special Consent to Extend the Time to Assess Taxes"

form). Additionally, in both cases, the Government was silent on the issue of whether or not the treatment applies until it was too late for the plaintiffs to prevent inordinate costs unto themselves; silence exacerbates the previous misrepresentations. *Id.* at 435, 440.

This case, however, goes a step further: in contrast to the *Fredericks* plaintiff, Mitsubishi received actual, written communications from the Government that its applications were approved. The USTR letters, along with the USTR's exclusion docket, underscore the gravity of how misleading the Government's communications were and go "beyond mere erroneous oral advice" because they were authorized by Joseph Barloon, the USTR's then General Counsel, on the USTR's letterhead. *Fredericks*, 126 F.3d at 440; Appx1023; Appx1035. The letters are official, authoritative, and fully include Supported Catalysts imported in any form or packaging within the scope of those products eligible for tariff exclusions.

Despite this, the USCIT declined to find that there was a misrepresentation because, according to its reasoning, the resulting exclusion language did not explicitly state that the covered "[p]late-type supported catalysts . . . applied . . . to a stainless-steel mesh" must be imported in block form. Appx0018. Further, to support that no misrepresentation occurred, the USCIT stated that "[b]oth exclusions issued by the USTR made no mention of the other components of the imported

merchandise," presumably[5] implying that this should have signaled to Mitsubishi that the exclusions were not fully granted. Appx0018. Contrary to the USCIT's conclusions, the USTR did not need to mention "other" components in the resulting exclusion language for the Government to have misrepresented that the resulting exclusions covered Supported Catalysts. Appx0018. USCIT's reasoning fails to understand and account for the character of Supported Catalysts.

Mitsubishi's Supported Catalysts are imported in blocks that house approximately 1,300 catalyst plates. Appx2278. A sample diagram is depicted below:



Appx0174. The catalyst plates are supported by a metal frame (with a protector), a set of seal bars, and a seal plate. Appx2278. The only function of the Supported

---

[5] The USCIT fails to explain how the wording of the resulting exclusions must have signaled to Mitsubishi that exclusions were not fully granted.

Catalysts is to facilitate a chemical reaction once it is installed in an Air Quality Control System ("AQCS") at coal burning power plants. *See supra*. The essential character of the Subject Merchandise thus comes from the supported catalysts themselves, and not their accompanying supportive components. Appx0097.

These supportive components are akin to product packaging (such as a cardboard partition containing multiples of the same product) because they are only intended to hold catalyst plates in place during shipping and installation. Product packaging is generally classified with the goods it contains:

> Packing materials and packing containers entered with the goods therein shall be classified with the goods if they are of a kind normally used for packing such goods. However, this provision is not binding when such packing materials or packing containers are clearly suitable for repetitive use.

Harmonized Tariff Schedule, General Rules of Interpretation ("GRI") 5(b); *Crystal Clear Indus. v. United States*, 843 F. Supp. 721, 725 (Ct. Int'l Trade 1994), *aff'd*, 44 F.3d 1001, 1003 (Fed. Cir. 1995) ("GRI 5(b) of the HTSUS indicates that the packing materials shall be classified with the goods contained within"); *Swimways Corp. v. United States*, 329 F. Supp. 3d 1313, 1316 n.5 (Ct. Int'l Trade 2018) (finding that plastic bags containing floatation products did not affect the classification of the products).

The USCIT's reasoning in denying the application of exclusions (due to the steel frame and other miscellaneous components surrounding approximately 1,300

catalyst plates in a block) is equivalent to denying that a product must be classified regardless of its packaging—ignoring GRI 5(b)—or denying that a similar tariff exclusion can be applied because multiples of a certain product arrived in a box, inside cardboard partitions. It is simply unreasonable to find that the exclusion applies only where the products come without packaging appropriate for their needs, as is the case here. The metal frames, seal bars, and seal plates are the most appropriate packaging for the Supported Catalysts because they offer the most practical storage and ease of installation. Moreover, the broad language of the exclusions is compatible with the description of the Subject Merchandise imported in block form, as explicitly granted per the USTR letters (which were responsive to Mitsubishi's specific requests). Thus, contrary to the USCIT's opinion, there are inconsistencies that fulfill the first element of an equitable estoppel claim.

Furthermore, to justify its erroneous finding that the Government did not make misrepresentations to Mitsubishi, the USCIT appears to be invoking the obsolete "more than" doctrine. Appx0018. The doctrine provides that, "when goods constitute more than a particular article because they possess additional significant features or perform additional nonsubordinate functions, they are not classifiable as that article." *JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1353 (Fed. Cir. 2000). In this decision, this Court held that the GRIs "set out

principles that govern classification issues without resort to judicially-developed doctrines such as the 'more than' doctrine":

> The introduction to the GRIs states that "classification of goods in the tariff schedule shall be governed by the following principles." GRI 1 then states that "classification shall be determined according to the terms of the headings and any relevant section or chapter notes." GRI 2(b) provides that "any reference in a heading to a material or substance, shall be taken to include a reference to mixtures or combinations of that material or substance." GRI 3 provides that "when, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings," they must be classified under the heading that (1) is the most specific; (2) describes the component which gives the imported good its essential character; or (3) occurs last in numerical order. **This statutorily-prescribed, comprehensive, and systematic method of classification set forth in the GRIs supplants the judicially-created "more than" doctrine and precludes its applicability to cases arising under the HTSUS.**

*Id*. at 1354 (emphasis added). Since the Supported Catalysts' classifications are partly at issue, the case at bar arises out of the HTSUS; as such, the "more than" doctrine has no place in this analysis.

Also, the USCIT's conclusion that the USTR letters "partially" granted the exclusions is completely unsupported. There are no "partial" measures in the USTR's determination of whether China Section 301 tariff exclusion requests can be granted; an exclusion request simply is, or is not, granted.[6] Further, USTR letters

---

[6] The Section 301 exclusion Guidelines are clear that applicants are required to submit ample details for one particular product to review, per application; this implies that the USTR will provide a binary, "granted or denied," response because the Government examines narrow requests only, rather than broad requests that may be separated into multiple articles, and according to their respective HTSUS codes.

specify that exclusions *in Mitsubishi's requests* were granted. Appx1023; Appx1035. Thus, the USTR—together with CBP—clearly intended to include the very products that are the subject of Mitsubishi's exclusion requests in the first place.

There is no mechanism for the USTR to both grant and deny Mitsubishi's requests. Even if the exclusions, *arguendo*, only applied to catalyst plates, as the USCIT indicates, the misrepresentations remain apparent; if the Supported Catalysts imported in block form were intended to remain subject to China Section 301 tariffs and not be excluded, the USTR letters should have reflected complete denials. However, the letters indicate that the exclusions were granted. In its opinion, the USCIT points to the following language in the USTR's letters to find that Mitsubishi was "on notice" that the Subject Merchandise was not covered by the exclusion:

> The scope of the exclusion is governed by the scope of the 10-digit HTSUS subheadings and product descriptions in the annex to the product exclusion notice, and not by the product descriptions set out in any particular request for exclusion.

*Section 301 Exclusion Request Process: Filing Guidelines for Product-Specific Exclusion Requests*, USTR, https://ustr.gov/sites/default/files/enforcement/301 Investigations/Section%20301% 20Exclusion%20Request%20Guidelines.pdf.

Moreover, the USTR's comment portal reflects a status of only "granted" and only "denied" for each request; thus, the USCIT must be incorrect in its conclusion that Mitsubishi was given "partial" approvals, since it is obvious that the entire exclusion process contemplates only those two responses (fully granted or fully denied). *Public Docket: Index and Status of Requests for Exclusion from $200 Billion Trade Action (List 3)*, USTR, https://comments.ustr.gov/s/docket?docketNumber=USTR-2019-0005.

Appx0017. In the same letters, however, the USTR states that Mitsubishi's requests for China Section 301 tariff exclusions were granted; *therein lies the misrepresentation*. As such, Mitsubishi was not "on notice" that the Supported Catalysts imported in block form were not covered. In its applications for exclusions, Mitsubishi provided HTSUS codes and descriptions for the Subject Merchandise. The USTR and/or CBP could have rejected the applications for reasons including that the HTSUS codes were incorrect, or that the merchandise as described would not fall under the given HTSUS code, because the language of the exclusions and applicable HTSUS codes were reviewed by both USTR and CBP. *Section 301 Exclusion Request Process: Filing Guidelines for Product-Specific Exclusion Requests*, USTR.[7]

USCIT's opinion ignores CBP's role in the Section 301 exclusion request process. During this process, CBP conducts an "administrability review." *Id*. A product-specific exclusion request can be approved only if it is "administrable"; that is, the product description enables CBP to consistently identify and correctly classify the covered product at the time of entry. *Id*. In its guidelines for Section 301 exclusion requests, the USTR indicates that (1) product-specific exclusion requests "will be considered administrable <u>only if</u> the product description enables [CBP] to

---

[7]https://ustr.gov/sites/default/files/enforcement/301Investigations/Section%20301%20Exclusion%20Request%20Guidelines.pdf (last visited September 10, 2025).

consistently identify and correctly classify the covered product at time of entry" and (2) CBP "confirm[s] the accuracy of the HTSUS subheading cited." *Id*. The USTR thus worked in concert with CBP to confirm that Supported Catalysts imported in block form, the subjects of Mitsubishi's exclusion applications, not only fell under the correct HTSUS subheading indicated by Mitsubishi but were candidates for Section 301 exclusions. This means that the Government's review of Mitsubishi's exclusion applications—involving both the USTR and CBP—was not merely cursory; it was thorough and intentional.

Assuming that, during the China Section 301 tariff exclusion review process, the Government found that Supported Catalysts were ineligible for exclusions, it failed to provide notice to Mitsubishi; instead, the Government represented that Mitsubishi's Supported Catalysts were excluded from China Section 301 tariffs whether imported in block form or not. It is evident that CBP, at the USTR's request or direction, reviewed the applications that the USTR received. *Id.* Thus, by stating that Mitsubishi's requests were granted in the letters, Mitsubishi would have no reason to suspect that the Supported Catalysts imported in block form were not excluded from China Section 301 tariffs. Mitsubishi, like the builder in *PDT Holdings, Inc.*, reasonably presumed that, after conducting its review, the government made a final determination based on all available facts, and its communications were presumed to be truthful and accurate. Mitsubishi, following

the Government's procedures in good faith, is entitled to rely on the Government's determinations.

USCIT also clearly erred in finding that there was no misrepresentation because Mitsubishi "did not provide the USTR with specific language to use in the exclusions"; the China Section 301 tariff exclusion review process has no such requirement. *Procedures To Consider Requests for Exclusion of Particular Products From the Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 32,181, 32, 181-84; Appx0018. Moreover, Mitsubishi *did* provide detailed descriptions of both CM- and TRAC-type Supported Catalysts, repeatedly indicating that they are imported in block form. Appx1014, Appx1020; Appx1026, Appx1032. It defies logic that the Government would establish a procedure for importers to request China Section 301 tariff exclusions, require detailed information per product (per application), and then proceed to ignore that information by granting exclusions for different merchandise. *See Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576, 29,576-82 (June 24, 2019); *see also Section 301 Exclusion Request Process: Filing Guidelines for Product-Specific Exclusion Requests*,

USTR.[8] If such were the case, exclusion requests would be meaningless. The USTR clearly outlined specific rules and guidelines for exclusion requests so it could analyze each product on an individual basis and decide—together with CBP— whether an exclusion for that specific product was warranted. *See Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576, 29,576-82 (June 24, 2019); *see also Section 301 Exclusion Request Process: Filing Guidelines for Product-Specific Exclusion Requests*, USTR. [9] It is completely unreasonable to expect that Mitsubishi (and many others) crafted narrow, tailored applications for each product and in response received an exclusion for different merchandise. Appx1014, Appx1020; Appx1026, Appx1032.

If the resulting exclusion language did not align with Mitsubishi's requests, the USTR should have kept the language in the notice as-is but denied Mitsubishi's exclusion request. The USTR did not do so, and instead assured Mitsubishi that it received its requested exclusions. The USTR's representations to Mitsubishi that the exclusion requests were granted when, in reality, the Government actively denied

---

[8]https://ustr.gov/sites/default/files/enforcement/301Investigations/Section%20301%20Exclusion%20Request%20Guidelines.pdf (last visited September 10, 2025).
[9]https://ustr.gov/sites/default/files/enforcement/301Investigations/Section%20301%20Exclusion%20Request%20Guidelines.pdf (last visited September 10, 2025).

them at liquidation, is comparable to the Government's silence and subsequent denial of the status adjustment application in *Schwebel*.

Here, as in *Schwebel*, Mitsubishi adhered to the Government's procedures to obtain its approval for its requests; if the Government's intent was to deny those requests, it simply never communicated them. *Schwebel*, 967 F.3d at 105. The misrepresentations are more pronounced in this case, however, because the Government did not merely stay silent, but ***affirmatively advised*** Mitsubishi that its exclusion requests for the CM and TRAC Supported Catalysts imported in block form were approved. The Government's subsequent silence likewise "would reasonably suggest" that Mitsubishi was fully within its rights to employ the exclusions. *Id*. Thus, through affirmative statements, subsequent silence, and denial to apply Mitsubishi's granted exclusions at liquidation, the Government clearly misrepresented its position on China Section 301 tariff exclusion applicability to Mitsubishi's Supported Catalysts and, consequently, misled Mitsubishi.

B.  Mitsubishi reasonably relied on USTR's letters granting China Section 301 tariff exclusions because the Government, through the USTR and CBP, had authority to both issue exclusions and apply them to the Supported Catalysts upon their importation.

A party acting in reasonable reliance on the government's misrepresentation, where all other elements are met, will succeed on a claim of equitable estoppel against it. *Heckler*, 467 U.S. at 59; *Fredericks*, 126 F.3d at 442. Reliance is

reasonable where "the party claiming estoppel did not know nor should it have known that its adversary's conduct was misleading." *Fredericks*, 126 F.3d at 442 (*quoting Heckler*, 467 U.S. at 59). The party alleging estoppel reasonably relies on statements of another when it is communicated directly, as opposed to through a third party. *See United States v. Eisenberg*, 149 F. Supp. 3d 71, 92-93 (D.D.C. 2015). Courts are more likely to apply estoppel against the government when it makes misrepresentations of fact, rather than misrepresentations of law. *Fredericks*, 126 F.3d at 444. Acts or omissions of government officers, if authorized to bind the United States and within the scope of their authority, will work estoppel against the government. *Fredericks*, 126 F.3d at 443.

The Government can be estopped by the acts of its agents, officers, or employees if they act within the scope of their authority. *California-Pac. Utilities Co. v. United States*, 194 Ct. Cl. 703, 720 (1971). The existence of and scope of authority may be determined by agency procedures, regulations, or statutes. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("The scope of [a government agent's] authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.").

Entering into agreements with private parties, issuing guidance, and granting a private party exceptions to certain requirements under the law is generally within a federal agency's scope of authority. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414,

419-420 (1990); *Int'l Light Metals v. United States*, 194 F.3d 1355, 1358 (Fed. Cir. 1999); *Fredericks*, 126 F.3d at 436; *Schwebel*, 967 F.3d at 99.

In *Fredericks*, the plaintiff sought a tax assessment extension from the IRS, in accordance with federal law. 126 F.3d at 436. Similarly, the court in *Schwebel* discussed USCIS's authority to approve visa applications and status adjustments based on federal statute. 967 F.3d at 99. In both cases, the courts agreed that the plaintiffs reasonably relied on the statements made by the government, finding that equitable estoppel applied. *Id.* at 105-07; *Fredericks*, 126 F.3d at 445, 451.

USTR derives its authority to provide tariff exclusions from The Trade Act of 1974. 19 U.S.C. §§ 2411-20; *see Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*, 83 Fed. Reg. 47,974, 47,974 (Sept. 21, 2018). It issues exclusions and their respective extensions, which then become available through the Federal Register. *See, e.g.*, *Notice of Extension of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 89 Fed. Reg. 46,948, 46,948 (May 30, 2024); *see also Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 90 Fed. Reg. 42,500 (Sept. 2, 2025). Additionally, in recent litigation, the USTR framed its ability to grant China Section 301 tariff exclusions as "responsive" to concerns about the tariff's effects to the United States economy. *In re Section 301 Cases*, 628 F. Supp.

3d 1235, 1248 (Ct. Int'l Trade 2023). Therefore, it is clear that providing exclusions to China Section 301 tariffs is squarely within the USTR's authority.

CBP's authority in classifying merchandise is established by the Tariff Act of 1930. 19 U.S.C. § 1500(b). Its role in reviewing the HTS codes of imported merchandise is well-documented; CBP issues rulings advising the public and internally regarding what it believes to be proper classifications of merchandise on a case-by-case basis. *See, e.g.*, HQ H334008 (U.S. Customs & Border Prot. Feb. 14, 2025), https://rulings.cbp.gov/ruling/H334008. The Government frequently defends CBP classification decisions before USCIT and this Court. *See, e.g.¸ Shamrock Bldg. Materials, Inc.*, 119 F.4th at 1346; *Honeywell Int'l, Inc. v. United States*, 756 F. Supp. 3d 1346, 1346 (Ct. Int'l Trade 2025).

Here, the USTR and CBP worked as a unit to grant China Section 301 tariff exclusions to applicants like Mitsubishi. Although, as discussed *supra*, the USTR accepts applications for review, they are also reviewed by CBP for administrability before they can be approved. *Section 301 Exclusion Request Process: Filing Guidelines for Product-Specific Exclusion Requests*, USTR.[10] In its Guidelines, the Government informs prospective exclusion applicants:

> A product-specific exclusion request **will be considered administrable only if the product description enables U.S. Customs and Border Protection (CBP) to consistently identify and correctly**

[10]https://ustr.gov/sites/default/files/enforcement/301Investigations/Section%20301%20Exclusion%20Request%20Guidelines.pdf (last visited September 10, 2025).

**classify the covered product *at time of entry.*** Therefore, requests should include detailed physical descriptions of the product, avoid ambiguous terms or clauses, and avoid descriptors that CBP cannot reasonably verify. Requests should also include an accurate reference to the 10-digit HTSUS subheading in which the product is classified.

*Id.* The Guidelines further detail a list of content that the exclusion should and should not have. *Id.* The Government highlights administrability in its Guidelines because it is a prerequisite to approving the exclusion. *Id.* Thus, applicants are required to supply sufficient information regarding their merchandise so that both the USTR and CBP can make their own independent determinations that the exclusion sought is appropriate and justified.

The Government acted within the scope of its authority when USTR issued China Section 301 tariff exclusions for Supported Catalysts, supported by CBP's own analysis and review. CBP, pursuant to its own authority, reviewed Mitsubishi's exclusion applications for both TRAC and CM Supported Catalysts; it must have agreed with the contents of the applications, including the HTSUS codes and descriptions, because the USTR, under its own authority under The Trade Act of 1974, granted both exclusions. 19 U.S.C. §§ 2411-20; *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices*, 83 Fed. Reg. 47,974, 47,974 (Sept. 21, 2018). Moreover, the USTR's letters permitting Mitsubishi to take advantage of the exclusions for the Supported Catalysts, imported in block form, were signed by Joseph Barloon, its General Counsel during that period, on USTR

letterhead. Appx1023; Appx1035. As the IRS agents in *Fredericks* and USCIS in *Schwebel*, these communications were issued by the party with the power to grant the plaintiffs' requests. "An exclusion in response to your request has been granted by excluding from the additional tariffs products covered by a specially drafted description contained in the annex to the exclusion notice," is, therefore, a statement that the Government made—on two separate occasions—with complete and actual authority. *Id.*

Since the exclusion applications were reviewed within the scope of the USTR's and CBP's authority, and USTR letters were issued within the scope of the USTR's authority, Mitsubishi reasonably relied on them. Mitsubishi applied for narrow, product-specific exclusions. Appx1013-1014; Appx1025-1026. These applications were made to USTR, the appropriate office for such a request. *See Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301*, 84 Fed. Reg. 29,576, 29,576 (June 24, 2019). The Government's only response was that its requests were "granted." Appx1023; Appx1035. Moreover, as discussed *supra*, the language of the exclusions the Government provided were *broader* than what Mitsubishi had requested. USTR must know that by issuing letters to applicants regarding the statuses of their applications, the applicants would rely on them to make choices regarding what products they will import. Applicants like Mitsubishi have no reason to know that

these letters could be misleading. The USTR letters were responsive to narrow requests, and their contents were approved by parties with authority to send them; therefore, Mitsubishi could not have known that the letters would be misleading and its reliance on them is obviously reasonable.

C.    Based on the USTR letters, Mitsubishi imported Supported Catalysts to its detriment, being forced to pay tens of millions of dollars in unanticipated China Section 301 tariffs.

A party will prevail on a claim of equitable estoppel if, having met the other elements, it has changed its position for the worse in reliance on another's conduct. *Heckler*, 467 U.S. at 59. In acting to one's detriment, he or she may be liable for inordinate and unexpected costs or experience the permanent loss of certain legal rights altogether. *Fredericks v. C.I.R.*, 126 F.3d 433, 435 (approximately $200,000 in taxes and interest); *PDT Holdings, Inc.*, 712 S.W.3d at 605 (over $1,000,000 in building costs); *Vassenelli v.the USCITy of Syracuse*, 138 A.D.3d 1471, 1473 (2016) (medical insurance penalties); *Schwebel*, 967 F.3d at 101 (eligibility for immigration status adjustment as a child under the CSPA).

The harm to Mitsubishi is clear: it was forced to pay tens of millions of U.S. dollars in China Section 301 tariffs that it was assured, through statements made by the Government, that it would not have to pay. Mitsubishi's payment of these duties, for only two types of Supported Catalysts, is astronomically higher than those found

in similar cases, such as those discussed above. *See supra*. As such, Mitsubishi relied on the USTR's and CBP's grant of its exclusion applications to its detriment.

Had Mitsubishi known that it was liable for China Section 301 tariffs on the Subject Merchandise, it would have either imported fewer Supported Catalysts or none at all. Also, Mitsubishi could have looked for alternative sources outside of China. Mitsubishi would not have paid China Section 301 tariffs had the Government decided to honor the exclusions or give Mitsubishi notice, prior to importation, that the Supported Catalysts, imported in block form and described in the exclusion applications, *were* subject to China Section 301 tariffs. The lack of notice underscores the egregiousness and unfairness of this harm. Mitsubishi believed that it followed the proper channels to lawfully, in good faith, obtain exclusions from the tariffs, or, in the alternative, be informed by the USTR that it would not be eligible for them. The Government cannot now seek to profit from the "surprise," costly harm it inflicted upon Mitsubishi, which relied on the Government's exclusion grants to its detriment.

D.      The Government's refusal to honor the exclusions it granted to Mitsubishi is affirmative misconduct.

The Government engaged in affirmative misconduct because it granted exclusions—according to its own procedure—that Mitsubishi rightfully relied on and subsequently failed to honor them, which is a misrepresentation that caused an egregiously unfair result. There is no definitive test for affirmative misconduct, but

46

the U.S. District Court for the District of Columbia recently determined that it exists when there is a misrepresentation, concealment, or behavior that will cause "an egregiously unfair result." *Masters Pharmaceutical, Inc. v. DEA*, 861 F.3d 206, 225 (D.C. Cir. 2017).

Also, as discussed *supra*, dishonesty on the part of the government yielding severe penalties, such as the permanent loss of rights or inordinate costs, is sufficient to support a claim of equitable estoppel. *See Fredericks*, 126 F.3d at 444 (misleading statements were affirmative misconduct that led to additional tax deficiency assessments and interest); *PDT Holdings, Inc.*, 712 S.W.3d at 604 (city's misrepresentations were affirmative misconduct that risked over $1 million in costs for builder to bring building into compliance); *Schwebel*, 967 F.3d at 102 (government misrepresentations were affirmative misconduct because, absent plaintiff's case, would have resulted in loss of her ability to adjust her immigration status as a "child" under federal law). Specifically, in *Fredericks*, the United States Court of Appeals for the Third Circuit, while referring to *Heckler*, reasoned as follows:

> **The IRS' decision to lie doggo, and induce the taxpayer into thinking all was well, coupled with its additional eight-year delay in producing a document it previously represented as non-existent, compels us to conclude that the IRS was guilty of affirmative misconduct** at least as of June 30, 1984. Fredericks has met his burden of establishing the misrepresentation and affirmative-misconduct elements of an estoppel claim against the government.

*Fredericks*, 126 F.3d at 442 (emphasis added). Courts are willing to find affirmative misconduct on behalf of the government when it benefits from its acts or omissions and, specifically, induces the public into action that benefits the government. *Fredericks*, 126 F.3d at 442, 444.

In *Brewster v. City of Los Angeles*, 672 F. Supp. 3d 872, 908-09 (C.D. Cal. 2023), the Los Angeles Police Department ("LAPD") made statements, contrary to state law, to individuals (who had their car impounded due to license suspensions) that they could not retrieve their vehicles even if they were able to provide an alternative, licensed driver. The result was that vehicles belonging to owners who received erroneous advice were impounded far longer when compared to others; the LAPD thus benefited from misinforming the public because it generated more income from storage fees. *Id.* at 972. Although the United States District Court for the Central District of California did not explicitly state that the LAPD's actions were affirmative misconduct, those actions clearly caused an egregiously unfair result; government agents misstated the law and, in so doing, unjustly obtained income from private parties that it otherwise would not have received. *Id.*

Courts are alert to egregiously unfair results when the federal government benefits from its own misstatements at the expense of a private party. *See Am. Elec. Lab'ys, Inc. v. United States*, 774 F.2d 1110, 1115-17 (Fed. Cir. 1985). In *Am. Elec. Lab'ys, Inc.*, this Court reversed and remanded a ruling from the Armed Services

Board of Contract Appeals in favor of the plaintiff, a weapons contractor, when it continued to perform under its contract with the U.S. Army with assurances that it would be compensated for overrun costs totaling $900,000.[11] *Id.* Affirmative misconduct is easily inferred, although not explicitly discussed, because the government never discouraged the plaintiff from performing and signed a contract modification, having determined that the plaintiff's performance under the contract was in the best interests of the government. *Id.*

Here, the Government's refusal to recognize exclusions that it granted caused an egregiously unfair result and was, therefore, affirmative misconduct. As discussed at length, the USTR letters informed Mitsubishi that China Section 301 tariff exclusion requests reviewed by the USTR and CBP were granted. However, this was misrepresented and CBP subsequently denied the application of granted exclusions at liquidation. Specifically, it is egregiously unfair when an importer, as here, is told in writing by the Government that its imports are excluded from Section 301 duties—for the Government to then reverse its position once the products have already been imported and charge the importer tens of millions of dollars in Section 301 duties, that Mitsubishi had not accounted for. The result is egregiously unfair because of the totally unforeseen great harm and expense to Mitsubishi's business and its customers.

---

[11] However, the plaintiff's work totaled $1.3 million in overrun costs.

Such a consequence is comparable to other types of estoppel cases against the government, including *Brewster*. Both cases involve the Government profiting from giving adverse advice to private parties, despite being tasked with providing information that the private parties obviously intended to rely on. Moreover, the LAPD (through state law and knowledge of internal policies) and the Government here (through its own analysis and review of Mitsubishi's exclusion applications) were best positioned to advise the private parties. The effects of the Government's misrepresentations are more pronounced here, however, because Mitsubishi, a single party, was forced to pay tens of millions of dollars in Section 301 duties, as opposed to many singular individuals paying thousands. Additionally, this case involves no ordinance that the parties failed to locate; the Government's statements were the required authority.

The Government's misrepresentations also led to egregiously unfair results because—after apparently conducting a thorough review of Mitsubishi's exclusion applications—the Government failed to communicate to Mitsubishi that Supported Catalysts imported in block form did *not*, in fact, qualify for the exclusions. The facts found in *Am. Elec. Lab'ys, Inc*. resemble this case because, in both cases, the respective government offices were responsible for communicating whether the plaintiff would receive some kind of separate treatment, whether an amendment to a contract or an exclusion. However, also in both cases, the Government's failure

resulted in the plaintiffs' time and money being squandered. Again, Mitsubishi's case offers a more pronounced example of an egregious, unfair result from the Government's misrepresentations: while the plaintiff in *Am. Elec. Lab'ys, Inc.* sought compensation for over $1.3 million, Mitsubishi paid tens of millions of dollars in tariffs that it was assured it would not have to pay. The Government deprived Mitsubishi of the opportunity to make reasonable business decisions and prepare for the additional costs of importing Supported Catalysts into the United States.

Here, as the court in *Fredericks* noted, the Government's "decision to lie doggo and induce [Mitsubishi] into thinking all was well" should compel this Court to conclude that the Government "was guilty of affirmative misconduct." *Fredericks*, 126 F.3d at 442. Thus, Mitsubishi has clearly met its burden of establishing affirmative misconduct on behalf of the Government and the remaining equitable estoppel elements are likewise satisfied.

## II. This Court Should Ignore Other Considerations Referenced by the USCIT.

USCIT referenced—but did not use as part of its reasoning for the ruling—the Government's assertion that Mitsubishi could have "tried to work with the USTR to edit the language of the exclusions" in the USTR letters if Mitsubishi believed there was an error. Appx0017. This litigation came about because Mitsubishi had no reason to believe that there was an error. If upon further internal review, the

Government found that there *was* an error, it would have been within its authority to revoke the Section 301 exclusion grants. To date, the Government has not revoked the USTR letters. Moreover, there is no administrative process to "clarify" USTR exclusion determination letters. Thus, Mitsubishi could not have reasonably been expected to seek any clarification or "work" with USTR.

There is a process to protest CBP liquidation decisions, which Mitsubishi availed itself of. However, there was no such process for the USTR's exclusion requests. Having an email address available does not create an administrative process; if that were the case, any agency with a contact would have its own administrative process. *See Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248-49 (D.C. Cir. 2004) ("Whether a statute requires exhaustion [that is, when Congress requires resort to the administrative process as a predicate to judicial review] is purely a question of **statutory interpretation**. If the statute does mandate exhaustion, a court cannot excuse it.") (emphasis added).

Mitsubishi did what was required to file the USCIT case under 19 U.S.C. § 1581(a): it filed an administrative protest with CBP, which CBP denied. No other process was available to cure this egregiously unfair outcome.

## III. Alternatively, This Court Must Enforce the USCIT's Finding That Supported Catalyst Plates Qualify for Exclusions from China Section 301 Tariffs.

In the event that this Court does not agree with the arguments set forth above, it must find that the Supported Catalysts' plates are excluded from China Section 301 duties and order reliquidation of the Subject Merchandise, with a refund of the tariff as applied, at a minimum, to Supported Catalysts' plates.

The USCIT concluded that Supported Catalysts' plates should have been excluded from China Section 301 tariffs. *See* Appx2318 ("Supported catalysts on a mesh plate may be excluded from 301 duties"). However, the USCIT failed to enforce its finding. Appx2318. Thus, this Court must, at a minimum, enforce USCIT's limited finding as to the applicability of exclusions to Supported Catalysts' plates.

Application of tariffs and/or tariff exclusions to parts or components of the imported product is not beyond trade norms. *See, e.g., CSMS 64384423 - UPDATED GUIDANCE: Import Duties on Imports of Steel and Steel Derivative Products* (U.S. Customs & Border Prot. Mar. 17, 2025), https://content.govdelivery.com/bulletins/gd/USDHSCBP-3d66da7?wgt_ref=USD HSCBP_WIDGET_2. The USTR's investigation into the semiconductor industry is another recent example. *See Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Targeting of the Semiconductor*

*Industry for Dominance*, 89 Fed. Reg. 106,725, 106,725 (Dec. 30, 2024). In the investigation notice, the USTR explained that the investigation "initially will focus on PRC manufacturing of foundational semiconductors (also known as legacy or mature node semiconductors), ***including to the extent that they are incorporated as components into downstream products*** for critical industries like defense, automotive, medical devices, aerospace, telecommunications, and power generation and the electrical grid." *Id*. at 106,725 (emphasis added). It follows that the USTR has adopted an approach that may result in tariffs being applied to components of imported products.

In fact, partial tariffs have been, and are currently being, applied. For example, Section 232 steel and aluminum tariffs are only applied to qualifying goods' steel and aluminum content; this means that non-steel and non-aluminum content is *not* subject to Section 232 tariffs. *CSMS 64384423 - UPDATED GUIDANCE: Import Duties on Imports of Steel and Steel Derivative Products* (U.S. Customs & Border Prot. Mar. 17, 2025), https://content.govdelivery.com/bulletins/gd/USDHSCBP-3d66da7?wgt_ref=USDHSCBP_WIDGET_2; *CSMS # 64384496 - UPDATED GUIDANCE: Import Duties on Imports of Aluminum and Aluminum Derivative Products* (U.S. Customs & Border Prot. Mar. 17, 2025). Moreover, non-steel and non-aluminum content of applicable derivative products may be subject to other types of tariffs. *See*, *e.g.*, *CSMS 64384423 - UPDATED GUIDANCE: Import Duties*

*on Imports of Steel and Steel Derivative Products* (U.S. Customs & Border Prot. Mar. 17, 2025), https://content.govdelivery.com/bulletins/gd/USDHSCBP-3d66da7?wgt_ref=USDHSCBP_WIDGET_2. Additionally, numerous Executive Orders call for various tariff stacking and carve-outs where parts or components of products are excluded from certain tariffs. Exec. Order No. 10,908, 90 Fed. Reg. 14,705 (Mar. 26, 2025) (USMCA-qualifying automobiles subject to 25% tariff on non-U.S. content); Exec. Order No. 14,289, 90 Fed. Reg. 18,907 (Apr. 29, 2025) (non-tariff stacking hierarchy); Exec. Order No. 10,962, 90 Fed. Reg. 37,727 (July 30, 2025) (non-copper content of listed derivatives subject to other tariffs). Thus, application of tariff exclusions to parts or components of the imported product is appropriate.

Here, as the USCIT discussed, Mitsubishi's Supported Catalysts' plates qualify for China Section 301 tariff exclusions. Mitsubishi's Supported Catalysts are blocks that predominantly consist of approximately 1,300 catalyst plates, which are supported by several other components. Appx0097; Appx2278. The plates of the TRAC-type Supported Catalyst, with enhanced mercury oxidation, contain "oxides of titanium (Ti), molybdenum (Mo) and/or tungsten (W), vanadium (V), and phosphorus (P) that is applied to a stainless steel mesh." Appx1025-1026. As discussed, *supra*, this language fits squarely into the exclusion's broader language, "[p]late-type supported catalysts (reaction accelerators) for reduction of nitrous

oxides (NOx) with enhanced mercury oxidation, with oxides of base metals being the active substances, applied to a stainless steel mesh." Appx2308.

The CM-type Supported Catalysts similarly fit into their respective exclusion's language. These catalysts contain "active compounds of molybdenum, tungsten, vanadium, etc. on a titanium dioxide based ceramic material that is applied to a stainless steel mesh." Appx1014. The exclusion covering the CM-type Supported Catalysts provides for "[p]late-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx), with base metals being the active substances, applied on a titanium dioxide based ceramic material to a stainless steel mesh." Appx2308. Thus, at a minimum, plates of both Supported Catalysts are covered by their respective exclusions.

Because China Section 301 tariff exclusions cover, at a minimum, Supported Catalysts' plates, as determined by the USCIT, and because applying exclusions to the plates would be consistent with emerging legal norms and the administration's tariff approach, this Court must, at a minimum, enforce the exclusions as to the plates.

## IV. Supported Catalysts Imported in Block Form are Properly Classified Under Heading 3815, HTSUS.

Should this Court find that the Government is equitably estopped from denying the application of China Section 301 tariff exclusions to the Subject Merchandise, or that, at a minimum, the Supported Catalysts' plates are covered by

56

the exclusions, this Court need not reach the classification analysis. However, should this Court decide to address the classification, Mitsubishi maintains that the subject Supported Catalysts imported in block form are properly classified under heading 3815, HTSUS, as "[r]eaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included," and, more specifically, as "other … **supported catalysts**" of subheading 3815.19.00, HTSUS, which further confirms the applicability of the exclusions.

This Court reviews a grant of summary judgment by the USCIT for correctness as a matter of law and decides *de novo* the proper interpretation of the tariff provisions, as well as whether there are genuine issues of material fact precluding summary judgment. *Millenium Lumber Distrib. v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009). This Court employs the same standard employed by the USCIT to assess Customs' classification determinations. *LeMans Corp. v. United States*, 660 F.3d 1311, 1315 (Fed. Cir. 2011). A classification decision involves two steps. First, the court must "ascertain the meaning of specific terms in the tariff provisions." *Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102, 1106 (Fed. Cir. 2014). Second, the court must determine "whether the subject merchandise comes within the description of those terms." *Id*. "Determining the proper meaning of terms is a question of law that this Court reviews *de novo*, while determining whether the item fits within such meaning is a question of fact that we review for

clear error." *Avenues In Leather, Inc. v. United States*, 423 F.3d 1326, 1330 (Fed. Cir. 2005). "The appellant bears the burden of establishing reversible error in the decision of the Court of International Trade, by showing that the court erred in its interpretation of the law, or that its findings of fact are clearly erroneous with due consideration to the appropriate level of deference." *Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 925 (Fed. Cir. 2003).

The USCIT concluded that Supported Catalysts imported in block form were "parts" within the larger SCR system rather than apparatus and were appropriately classified under subheading 8421.99.00, HTSUS – "Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof; parts; other." Appx0013-0014. First, Mitsubishi contends that the USCIT erred as a matter of law when it included chemical conversion that does not involve removal (neither physical nor chemical) within the meaning of the term "purify" when analyzing the applicability of heading 8421, HTSUS. Second, Mitsubishi contends that the USCIT clearly erred as a matter of fact by finding that Supported Catalysts imported in block form are not "supported catalysts" of heading 3815, HTSUS, but rather "parts" in the gas purifying SCR system under HTSUS heading 8421.

The USCIT correctly determined that Supported Catalysts imported in block form are not "apparatus[es]" of heading 8421, HTSUS, as originally argued by the

government. Appx0009-0011. However, without analyzing the classification of Supported Catalysts under GRI 1 as a standalone article, the USCIT found Supported Catalysts to be appropriately classified as "parts" of the SCR system into which they are installed after importation. Appx0009-0011. Even though the USCIT correctly concluded that the SCR system was not acting as a filter, the USCIT erroneously concluded that the SCR system worked as a purifier of Heading 8421, HTSUS. Appx0011-0014. This resulted in the USCIT classifying Supported Catalysts imported in block form as "parts" within heading 8421, HTSUS. Appx0013-0014.

In reaching its conclusion, the USCIT was guided by dictionary definitions of the common terms because "the HTSUS and the ENs [did] not define the terms 'purify' or 'filter.'" Appx0011. Pursuant to the Merriam-Webster Dictionary, the USCIT defined the term "purify" as "to free from undesirable elements." Appx0011-0012. The USCIT continued by applying this definition to the SCR system as follows:

> The SCR catalyst system causes harmful NOx to be reduced through an oxidation-reduction reaction into harmless nitrogen gas and water. Pl.'s MSJ at 2. Effectively, the SCR system chemically converts the harmful gases into harmless gases. No matter is separated out of the flue gas suspension, thus, the SCR system is not acting as a filter. Rather, the SCR system works as a purifier, essentially freeing the flue gas from the undesirable and harmful NOx.

Appx0012. Even though the USCIT correctly summarized that the SCR system chemically converts gases (through Supported Catalyst blocks), it made a clearly

erroneous factual finding that the SCR system frees the flue gas from the undesirable and harmful NOx. Also, in this finding, USCIT erred as a matter of law when it included chemical conversion that does not involve removal (neither physical nor chemical) within the meaning of the term "purify."

Supported Catalyst blocks promote the reaction of ammonia with nitrogen oxides (NO and $NO_2$, collectively referred to as NOx) in the presence of oxygen. Appx0087. SCR technology utilizes a catalyst to promote a reduction reaction that chemically converts NOx into nitrogen and water. Appx0087. Thus, the reaction that occurs in Supported Catalyst blocks is just a conversion reaction referred to as "redox" or "oxidation-reduction" reaction, in which the NOx is said to have been reduced where the ammonia acts as the reducing agent, or reductant. Appx0087. The NOx molecule is simply converted to other molecules (nitrogen and water) while remaining in the flue gas. Appx0087.

As explained by Mitsubishi's expert, Dr. Scott Hinton, who holds a B.S. in Chemical Engineering and a Ph.D. in Heterogeneous Catalysis, in his unrefuted expert report (Appx0205-0261), chemical reactions occurring within SCR system (inherently, within Supported Catalysts' blocks) are not purification reactions because they **do not free** from undesirable elements. See Appx0240-0042, Appx0257 (emphasis added). Dr. Hinton explained that "in practice, appreciable NOx remains in the flue gas after treatment." Appx0241. "The NOx conversion

60

accomplished by the catalyst follows a balanced chemical reaction in which no mass is gained or lost." Appx0240. "Furthermore, the treated flue gas would not be considered 'pure,' even after extensive treatment, as it still contains numerous contaminants, including NOx." Appx0240. "As such, it does not … 'free from undesirable elements' as the term 'purify' is defined by Merriam-Webster." Appx0240. However, the USCIT completely ignored Dr. Hinton's report even though Dr. Hinton explained in detail why the process occurring within SCR system does not constitute purification. The government has not presented an expert witness of its own to refute Dr. Hinton's findings.

Next, USCIT also referenced Explanatory Notes (ENs). Specifically, the USCIT explained that "[t]he ENs … explicitly provide a clear example of purification performed through reduction oxidation catalysis." Appx0012. The USCIT added that "[t]he ENs relay that apparatuses for filtering or purifying gases include 'chemical filters and purifiers for air and other gases.'" Appx0012. The USICT also compared SCR systems to catalytic converters referenced in the ENs. Appx0013. The USCIT retracted, however, by stating that "there are fundamentally different chemical reactions occurring in the SCR system from those that occur in a catalytic converter." Appx0013. Yet, in the next sentence, the USCIT concluded that it "classifies the SCR catalyst blocks as a part in the gas purifying SCR system under

HTSUS heading 8421 … [d]ue to the similarities between a catalytic converter and the SCR system and the common use of the term 'purify.'"

In its reasoning, the USCIT fails to explain how SCR system acts as a chemical purifier. Moreover, the USCIT reached an absurd result: it classified Supported Catalysts in heading 8421 based on similarities between a catalytic converter and the SCR system while, at the same time, admitting that "there are fundamentally different chemical reactions occurring in the SCR system from those that occur in a catalytic converter." Appx0013. Most importantly, the USCIT clearly ignored Dr. Hinton's unrefuted findings confirming that Supported Catalysts and the SCR system do not act as chemical filters or purifiers. Appx0242, Appx2289.

Because Supported Catalysts' blocks that perform the conversion reaction within the SCR system do not physically or chemically filter or purify the flu gas, it follows that the SCR system and Supported Catalysts cannot be classified in heading 8421, HTSUS, which provides for "[c]entrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof."

As such, pursuant to GRI 1, which provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes," Supported Catalysts imported in block form must be classified as other "supported catalysts" in subheading 3815.19.00, HTSUS, which is the only subheading that properly describes the Subject Merchandise within the HTSUS.

Specifically, each imported block of Supported Catalysts consists predominantly of approximately 1,300 Supported Catalyst plates. Appx2278. These Supported Catalyst plates provide the blocks with the functionality and fully correspond to the supported catalysts exemplified in ENs to Heading 3815, HTSUS. This has been specifically noted in Dr. Hinton's expert report. Appx0248-0250.

The USCIT also noted that "SCR catalyst blocks were imported fully formed." Appx0016. "They were composed of supported catalysts and catalyst plates, but also, a protector, a set of seal bars, and a seal plate." Appx0016. However, all these miscellaneous components do not affect the functionality of the Supported Catalyst plates and are simply used to hold catalyst plates in place in a block form and "provide a convenient method of exposing the flue gas to the catalyst." Appx0206. As such, pursuant to GRI 5(b), these miscellaneous components are akin to packaging materials and/or packaging containers entered with the Supported Catalysts and shall be classified with the Supported Catalysts under subheading 3815.19.00, HTSUS.

## CONCLUSION

For all the foregoing reasons, Mitsubishi respectfully requests that this Court reverse the opinion and judgment of the USCIT and hold that the government must be equitably estopped from denying the application of the subject China Section 301 tariff exclusions to the Subject Merchandise. Alternatively, Mitsubishi respectfully

requests that this Court enforce the opinion and judgment of the USCIT and hold that the subject China Section 301 tariff exclusions apply, at a minimum, to Supported Catalyst plates and that subject entries be reliquidated with appropriate refunds.

Respectfully submitted,

/s/ Eric R. Rock

Eric R. Rock
*Counsel of Record*
Serhiy Kiyasov
*Attorney*
ROCK TRADE LAW, LLC
134 N. LaSalle St., Ste 1800
Chicago, IL 60602
erock@rocktradelaw.com

*Attorneys for Plaintiff-Appellant*

September 12, 2025

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in Circuit Rule 32-1(a) and Federal Rules of Appellate Procedure 32(a)(5)(A). This brief uses a proportional typeface and 14-point font, and contains 13,998 words.

Respectfully submitted,

/s/ Eric R. Rock

Eric R. Rock
*Counsel of Record*
Serhiy Kiyasov
*Attorney*
ROCK TRADE LAW, LLC
134 N. LaSalle St., Ste 1800
Chicago, IL 60602
erock@rocktradelaw.com

*Attorneys for Plaintiff-Appellant*

September 12, 2025

# ADDENDUM

Slip Op. 25-53

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MITSUBISHI POWER AMERICAS, INC., | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Judge |
| UNITED STATES, | |
| Defendant. | Court No. 21-00573 |

## OPINION AND ORDER

Dated: April 29, 2025

[In a Customs classification matter, judgment issued declaring classification other than as claimed by the parties.]

Serhiy Kiyasov, Rock Trade Law, LLC, of Chicago, IL, argued for the plaintiff Mitsubishi Power Americas, Inc. With him on the brief were Eric Roland Rock and Thomas Michael Keating.

Luke Mathers, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for the defendant. With him on the brief were Brett A. Shamute, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Justin R. Miller, Attorney-In-Charge. Of counsel on the brief was Michael Andrew Anderson, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Restani, Judge: Before the court are cross-motions for summary judgment. Pl.'s Mem. of

Law in Support of Confidential Mot. for Summ. J., ECF No. 55 (Aug. 21, 2024) ("Pl.'s MSJ");

Def.'s Confidential Cross-Mot. for Summ. J. and Resp. in Opp. to Pl.'s Mot. for Summ. J., ECF

No. 64 (Dec. 13, 2024) ("Def.'s MSJ"). Plaintiff Mitsubishi Power Americas, Inc. ("Mitsubishi")

challenges the United States Customs and Border Protection's ("Customs") classification of

selective catalytic reduction ("SCR") catalyst blocks under heading 8421 of the Harmonized Tariff

Schedule of the United States ("HTSUS"). Pl.'s MSJ at 4. At issue is whether the SCR catalyst

blocks imported by Mitsubishi fall under heading 8421, "Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof," or heading 3815, "Reaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included," of the HTSUS.  Broadly, Mitsubishi argues that because the SCR catalyst blocks are made of a combination of active catalytic chemical compounds and support material, the SCR catalyst blocks are properly classified under subheading 3815.19.00, HTSUS.  Pl.'s MSJ at 12–13. The United States ("government") contends that SCR catalyst blocks serve as a gas filtering or purifying apparatus; thus, subheading 8421.39.80, HTSUS, is appropriate.  Def.'s MSJ at 2, 13. For the reasons laid out below, the court concludes that neither classification is correct, and the SCR catalyst blocks are properly classified under subheading 8421.99.00, HTSUS, as parts of a gas filtering or purifying apparatus.  Further, Mitsubishi's claim of equitable estoppel fails as no misrepresentation by the government occurred.

## BACKGROUND

### I.      Procedural Background

There are no material factual disputes in this case.  Pl.'s Statement of Undisputed Material Facts at 1, ECF No. 55-2 (Aug. 21, 2024) ("Pl.'s SMF"); Def.'s Statement of Material Facts at 1, ECF No. 64-1 (Dec. 13, 2024) ("Def.'s SMF").  The subject merchandise in question are SCR catalyst blocks.  Pl.'s SMF at ¶ 14; Def.'s SMF at ¶ 2.  The SCR catalyst blocks are products of China.  Def.'s SMF at ¶ 3.  Mitsubishi imported the merchandise in multiple entries made from July 2018 to September 2020 under subheading 3815.19.00, HTSUS.  Pl.'s SMF at ¶¶ 5–6. Customs classified Mitsubishi's SCR catalyst blocks under subheading 8421.39.40, HTSUS, and

thus applied a duty rate[1] increase of 25% <u>ad valorem</u>.[2] <u>Id.</u> at ¶¶ 8–9.

     Mitsubishi timely protested Customs' classification of the SCR catalyst blocks and argued the SCR catalyst blocks are properly classified under subheading 3815.19.00 because the SCR catalyst blocks facilitate and sustain the reaction of nitrous oxides ("NOx") and ammonia. Pl.'s SMF at ¶ 10; <u>see</u> Def.'s MSJ at 2, 8.  Mitsubishi further argues that classification of the SCR catalyst blocks under subheading 3815.19.00 prevents the SCR catalyst blocks from being subject to Section 301[3] duties under secondary heading 9903.88.03 due to exclusions issued by the Office of the United States Trade Representative ("USTR") that apply to goods classified under subheading 3815.19.00, HTSUS.  Amended Summons at 2, ECF No. 10 (Nov. 5, 2021); Def.'s MSJ at 8.  Customs denied Mitsubishi's protest.  Pl.'s SMF at ¶ 11.  Mitsubishi commenced this action to challenge Customs' classification.  Compl. at 1, ECF No. 11 (Jan. 4, 2022).

## II.    Description of Subject Merchandise

     The SCR catalyst blocks at issue are made of approximately sixteen individual catalyst units held together by a metal frame that includes a protector, a set of seal bars, and a seal plate.

---

[1] The duties at issue were not imposed until September 2018.  <u>See</u> note 3.

[2] Subheading 8421.39.40, HTSUS, covers "Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof: Other: Catalytic Converters."

[3] Section 301 of the Trade Act of 1974 permits the United States to impose trade sanctions on countries that maintain acts, policies, or practices that violate, or deny, U.S. rights or benefits gained pursuant to trade agreements, or are otherwise unjustifiable, unreasonable, or discriminatory, and burden or restrict U.S. commerce.  19 U.S.C.A § 2411.  In 2018, pursuant to Section 301, the U.S. Trade Representative conducted an investigation and found that the acts, policies, and practices of China were unreasonable or discriminatory and burdened or restricted U.S. Commerce.  <u>Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation</u>, 83 Fed. Reg. 47974 (Sept. 21, 2018) ("83 Fed. Reg. 47974"); <u>Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation</u>, 84 Fed. Reg. 20459 (May 9, 2019) ("84 Fed. Reg. 20459").  As a result, the Trade Representative imposed duties on certain products from China.  83 Fed. Reg. 47974; 84 Fed. Reg. 20459.

Pl.'s SMF at ¶¶ 15, 17, 18; Def.'s SMF at ¶ 7, 11.  Each catalyst unit contains approximately eighty

catalyst plates.  Pl.'s SMF at ¶ 16; Def.'s SMF at ¶ 8.  The catalyst plates are stainless-steel mesh

plates coated in supported catalyst.  Pl.'s SMF at ¶¶ 51–52; Def.'s SMF at ¶ 9.  The supported

catalyst contains an active catalytic compound and a chemical support material.  Def.'s SMF at ¶

13.  Two different formulations of the supported catalyst are at issue, one with enhanced mercury

oxidation (TRAC type) and one without (CM type).  Pl.'s SMF at ¶¶ 68–69; Def.'s SMF at ¶¶ 24–

26.  Inside the SCR catalyst system, the supported catalyst in the SCR catalyst blocks catalyzes the

reaction of harmful NOx and ammonia into harmless nitrogen and water.  See Pl.'s SMF at ¶ 26.

SCR catalyst blocks are installed into larger SCR catalyst systems, along with an inlet duct,

ammonia injector, gas mixer, and outlet duct.  Def.'s SMF at ¶ 34.  The SCR catalyst system is a

component of larger air quality control systems used in coal burning power plants.  Pl.'s SMF at ¶

19; Def.'s SMF at ¶ 60.  These SCR systems process flue gas emitted from power plant boilers

and other combustion sources.  Def.'s SMF at ¶ 30.  The SCR system turns harmful NOx into

harmless byproducts (water and nitrogen).  See Pl.'s SMF at ¶ 23; Def.'s SMF at ¶¶ 30, 46.  SCR

catalyst systems work by first taking flue gas containing harmful NOx into the inlet duct and

spraying ammonia into the flue gas.  Def.'s SMF at ¶¶ 36–37.  Then, the ammonia and flue gas are

mixed, which allows the flue gas to pass through the SCR catalyst blocks.  Id. at ¶¶ 37–39.  Once

the flue gas passes through the SCR catalyst blocks, the flue gas no longer contains NOx as it exits

through the outlet duct.  Id. at ¶¶ 42–45.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(a) (2018).  The court will grant summary

judgment motions if "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  USCIT Rule 56(a).  Summary judgment is appropriate in tariff

classification cases where "there is no genuine dispute as to the nature of the merchandise and the classification determination turns on the proper meaning and scope of the relevant tariff provisions." Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (citation omitted). The court decides classifications de novo. See 28 U.S.C. § 2640(a)(1); Telebrands Corp. v. United States, 36 CIT 1231, 1234, 865 F. Supp. 2d 1277, 1279–80 (2012).

## DISCUSSION

### I.    Legal Framework

The meaning of a tariff term is a question of law, and whether subject merchandise falls under any given tariff term is a question of fact. See Wilton Indus. v. United States, 741 F.3d 1263, 1265–66 (Fed. Cir. 2013) (citations omitted). The plaintiff has the burden of demonstrating that the government's classification of the subject merchandise is incorrect but does not bear the burden of establishing the correct classification; instead, it is the court's independent duty to arrive at "the correct result, by whatever procedure is best suited to the case at hand." Jarvis Clark Co. v. United States, 733 F.2d 873, 876, 878 (Fed. Cir. 1984) (emphasis omitted); see 28 U.S.C. § 2643(b). In making this determination, the court "must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." Jarvis Clark, 733 F.2d at 878.

In order to determine the meaning of and apply a tariff term to the facts at hand, the court relies on the General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation ("AUSRIs"). Wilton Indus., 741 F.3d at 1266. The court applies the GRIs in numerical order, and only proceeds to each subsequent GRI if "proper classification of the imported goods cannot be accomplished by reference to a preceding GRI." Id. The first GRI, GRI 1, requires classification to "be determined according to the terms of the headings and any

relative section or chapter notes." GRI 1, HTSUS. HTSUS chapter and section notes are considered binding statutory law. See BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (citation omitted).

When "a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common or dictionary meaning in the absence of evidence to the contrary." Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001) (citations omitted). In construing tariff terms, the court may "consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used." Baxter Healthcare Corp. v. United States, 182 F.3d 1333, 1338 (Fed. Cir. 1999) (citation omitted). The court will also consider the Explanatory Notes ("ENs") to the international Harmonized Commodity Description and Coding System ("HTS")[4] in interpreting HTSUS terms. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n.1 (Fed. Cir. 1999). The ENs, however, do not constitute controlling legislative history; they do help to clarify the scope of HTSUS subheadings and to offer guidance in interpreting the HTSUS. Streetsurfing LLC v. United States, 11 F. Supp. 3d 1287, 1294 (CIT 2014) (citations omitted). When interpreting terms of the HTSUS, the court looks to identify what the tariff term would mean if used as part of the "common core language of trade." Blue Sky Color of Imagination, LLC v. United States, 698 F. Supp. 3d 1243, 1248 (CIT 2024).

## II.    Competing Tariff Provisions

Customs originally classified the SCR catalyst blocks under subheading 8421.39.40,

---

[4] The HTSUS is derived from the HTS, which "provides a common core language for trade." Marubeni Am. Corp. v. United States, 35 F.3d 530, 533 (Fed. Cir. 1994). Although the ENs are not dispositive of the meaning of the tariff terms, they are "generally indicative of [the] proper interpretation of the various provisions" and so are persuasive on the international meaning of the tariff terms. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n.1 (Fed. Cir. 1999).

HTSUS, which reads:

| Heading 8421 | Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof. |
|---|---|
| | Filtering or purifying machinery and apparatus for gases: |
| 8421.39 | Other |
| 8421.39.40 | Catalytic converters |

HTSUS. The applicable ad valorem duty rate is free. Pl.'s MSJ at 9. Customs liquidated the SCR catalyst blocks under secondary heading 9903.88.02[5] which is subject to an additional 25% duty. Id. at 9.

Mitsubishi alleges that the SCR catalyst blocks should be classified under subheading 3815.19.00, HTSUS, as:

| Heading 3815 | Reaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included: |
|---|---|
| | Supported catalysts: |
| 3815.19.00 | Other. |

HTSUS; Pl.'s MSJ at 9. Further, Mitsubishi argues that the TRAC type SCR catalyst blocks should be classified under secondary heading 9903.88.46,[6] HTSUS, as:

---

[5] Subheading 8421.39.40, HTSUS, is a "List 1" tariff classification under the current Chinese Section 301 Tariff Action subject to additional duties. See Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 28710-01 (June 20, 2018). Certain articles of subheading 8421.39.40, HTSUS, are subject to additional duties under subheading 9903.88.01 per HTSUS Chapter 99 Notes 20(a) and 20(b). See id.

[6] Subheading 3815.19.00, HTSUS, is a "List 3" tariff classification under the current Chinese Section 301 Tariff Action subject to additional duties. See 83 Fed. Reg. 47974. Certain articles of subheading 3815.19.00, HTSUS, were excluded from the additional duties, including those items under subheading 9903.88.46 and 9903.88.56 per subchapter III of chapter 99 of the HTSUS. See 85 Fed. Reg. 27489-02; 85 Fed. Reg. 48600-01.

> Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx) with enhanced mercury oxidation, with oxides of base metals being the active substances, applied to a stainless-steel mesh (described in statistical reporting number 3815.19.0000).

See <u>Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation</u>, 85 Fed. Reg. 27489-02 (May 8, 2020) ("Exclusion Notice 1"); Pl.'s MSJ at 10. Mitsubishi also argues that the CM type SCR catalyst blocks should be classified under secondary heading 9903.88.56, HTSUS, as:

> Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx), with base metals being the active substances, applied on a titanium dioxide based ceramic material to a stainless-steel mesh (described in statistical reporting number 3815.19.0000).

See <u>Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation</u>, 85 Fed. Reg. 48600-01 (Aug. 11, 2020) ("Exclusion Notice 2"); Pl.'s MSJ at 10–11. Finally, Mitsubishi argues that because these two secondary headings apply, Mitsubishi's importation of the TRAC and CM type SCR catalyst blocks should be duty- and tariff-free due to the tariff exclusions provided for in U.S. Notes 20(yy)(19) and (iii)(47) to Chapter 99, HTSUS, and Notes 20(yy)(20) and (iii)(48) to Chapter 99, HTSUS, respectively. Pl.'s MSJ at 9–11.

The government appears to retreat from Customs' original classification of the SCR catalyst blocks under subheading 8421.39.40, HTSUS. See Def.'s MSJ at 13. The government instead argues that the SCR catalyst blocks should be classified under subheading 8421.39.80, HTSUS, as:

| Heading 8421 | Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof: |
|---|---|
| | Filtering or purifying machinery and apparatus for gases: |
| 8421.39 | Other: |

8421.39.80              Other.

Like Customs' original classification, this subsection would make the SCR catalyst blocks subject to additional duties under Section 301, under secondary heading 9903.88.01, HTSUS.  Def.'s MSJ at 13.

For the reasons discussed below, the court concludes that the SCR catalyst blocks are classified according to subheading 8421.99.00, HTSUS, as:

Heading 8421          Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof:

                              Parts:

8421.99.00            Other.

Under this subheading, the SCR catalyst blocks remain subject to additional duties under Section 301, under secondary heading 9903.88.01, HTSUS.

I.        **The SCR Catalyst Blocks Are Properly Classified Under 8421.99.00, HTSUS**

          a.  **The SCR catalyst blocks serve as a part under heading 8421 of the HTSUS**

The government contends the SCR catalyst blocks are an apparatus, rather than a part in the larger SCR system.  Def.'s Reply, ECF No. 66 at 3–6, (Feb. 7, 2025) ("Def.'s Reply"). Mitsubishi argues that the SCR catalyst blocks are neither an apparatus nor a part under heading 8421, HTSUS.  Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J., ECF No. 65 at 5–10, 15–18, (Jan. 17, 2025) ("Pl.'s Resp.").

Heading 8421 covers "filtering or purifying machinery and apparatus, for liquids or gases; parts thereof."  HTSUS.  Neither the HTSUS nor the ENs define the term "part" or "apparatus," thus, the court looks to the common or dictionary meanings of the terms.  See Russell Stadelman & Co., 242 F.3d at 1048 (citations omitted).  The Federal Circuit has defined a "part" as either (1)

"an integral, constituent, or component part, without which the article to which it is to be joined could not function as such article," or (2) "dedicated solely for use with an article." Bauerhin Techs. Ltd. Pshp. v. United States, 110 F.3d 774, 778–79 (Fed. Cir. 1997) (citation omitted). The common meaning of "part" is "a constituent member of a machine or other apparatus."[7] Whereas "apparatus" is defined as "a set of materials or equipment designed for a particular use."[8]

The SCR catalyst blocks at issue in this case are installed into larger SCR reactors that may contain hundreds of SCR catalyst blocks. Def.'s MSJ at 8. The SCR catalyst blocks alone cannot process flue gas, as ammonia from the ammonia sprayer is needed to carry out the chemical reactions necessary to process the gas, thus the SCR catalyst blocks alone are not a material designed for a particular use per the definition of apparatus. See Pl.'s MSJ at 2. Rather, the SCR catalyst blocks are an integral part in the SCR system because the SCR catalyst blocks are required for the catalysis of NOx, therefore satisfying the Federal Circuit's definition of a part. See Def.'s MSJ at 6.

HTSUS Section XVI Note 2 requires that "parts of machines (not being parts of the articles of headings 8484, 8544, 8545, 8546 or 8547) are to be classified according to the following rules":

(a) Parts which are goods included in any of the headings of chapter 84 or 85 (other than headings 8409, 8431, 8448, 8466, 8473, 8485, 8503, 8522, 8529, 8538 and 8548) are in all cases to be classified in their respective headings;

(b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading (including a machine of heading 8479 or 8543) are to be classified with the machines of that kind or in heading 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate. However, parts which are equally suitable for use principally with the goods of headings 8517 and 8525 to 8528 are to be classified in heading 8517;

---

[7] Part, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/part (last visited Jan. 23, 2025).
[8] Apparatus, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/apparatus (last visited Jan. 23, 2025).

(c) All other parts are to be classified in heading 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate or, failing that, in heading 8485 or 8548.

HTSUS Note 2. The HTSUS chapter and section notes are considered binding statutory law. See BenQ Am. Corp., 646 F.3d at 1376 (citation omitted). "Note 2(b) establishes that parts are to be classified with the goods with which they are principally used unless such parts have a particular or respective heading as specified by Note 2(a), except for the headings listed in the parentheses in Note 2(a) which are themselves 'parts' provisions." ENI Tech. Inc. v. United States, 33 CIT 1219, 1231, 641 F. Supp. 2d 1337, 1350 (2009) (emphasis omitted). SCR catalyst blocks are used in SCR systems. Pl.'s MSJ at 2. Under Note 2(a), the SCR catalyst blocks are not a good included in any of the headings of chapter 84 or 85 of the HTSUS. Note 2 to sec. XVI, HTSUS. Thus, according to Note 2(b), the SCR catalyst blocks are to be classified with the goods in which they are used: the SCR catalyst system. Id.

**b. The SCR system is a gas purifier under 8421, HTSUS**

Mitsubishi contends that the SCR catalyst blocks do not filter or purify gases because no matter is removed during catalytic conversion of NOx to harmless byproducts. Pl.'s Resp. at 11–12. The government argues that the SCR catalyst blocks filter or purify flue gas because NOx is converted by the catalysts in the SCR catalyst blocks into nitrogen and water. Def.'s Reply at 2–3.

As the court set forth above, the SCR catalyst blocks are parts in the SCR system and thus this issue turns on whether the SCR system is a gas filter or purifier to be classified under heading 8421. The HTSUS and the ENs do not define the terms "purify" or "filter." Thus, the court turns to the common or dictionary meanings of the terms. See Russell Stadelman & Co., 242 F.3d at 1048 (citations omitted). The Merriam-Webster Dictionary defines "purify" as "to free from

undesirable elements."[9]  Whereas "filter" is defined as "a porous article or mass . . . through which a gas or liquid is passed to separate out matter in suspension."[10]

The SCR catalyst system causes harmful NOx to be reduced through an oxidation-reduction reaction into harmless nitrogen gas and water.  Pl.'s MSJ at 2.  Effectively, the SCR system chemically converts the harmful gases into harmless gases.  No matter is separated out of the flue gas suspension, thus, the SCR system is not acting as a filter.  Rather, the SCR system works as a purifier, essentially freeing the flue gas from the undesirable and harmful NOx.  Additionally, the two patents involved with the SCR catalyst blocks are U.S. Patent 8,470,728 B2: Exhaust Gas Purifying Catalyst and U.S. Patent 10,898,881 B2: Catalyst for Metal Mercury Oxidation Reactions and Nitrogen Oxide Reduction Reactions, and Exhaust Gas Purification Method.  Def.'s MSJ at 7.  Both patent names highlight that the SCR system and blocks are involved in gas purification.  As purifiers, the SCR system and SCR catalyst blocks, as parts thereof, fall into heading 8421 as gas purification machinery.

Mitsubishi alleges that because the SCR system does not remove any matter while performing the reduction oxidation catalysis, the SCR catalyst blocks cannot be purifiers.  Pl.'s Resp. at 11.  The ENs, however, explicitly provide a clear example of purification performed through reduction oxidation catalysis.  The ENs relay that apparatuses for filtering or purifying gases include "chemical filters and purifiers for air and other gases."  EN 84.21 (II)(B)(4).  As noted above, ENs are considered by the court when interpreting HTSUS terms.  Carl Zeiss, Inc., 195 F.3d at 1378 n.1.  The ENs give catalytic converters as an example of a chemical gas filtration

---

[9] Purify, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/purify (last visited Jan. 23, 2025).
[10] Filter, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/filter (last visited Jan. 23, 2025).

apparatus. See EN 84.21 (II)(B)(4). Catalytic converters perform a catalytic oxidation-reduction reaction, converting harmful hydrocarbons, carbon monoxide and NOx, into harmless water, carbon dioxide, nitrogen gas and oxygen. See Emmy Kritsanayiparkporn et al., Catalytic Converters for Vehicle Exhaust: Fundamental Aspects and Technology Overview for Newcomers to the Field, 3 Chemistry 630, 632 (2021).

Similarly, here, the SCR system converts NOx into nitrogen and water through a catalytic oxidation-reduction reaction. Pl.'s MSJ at 2. Both catalytic converters, which the ENs give as an example correctly classified under HTSUS heading 8421, and the SCR system at issue here, perform a catalytic oxidation-reduction reaction to purify gas by freeing the gas from harmful substances. The SCR system, however, is not a catalytic converter because there are fundamentally different chemical reactions occurring in the SCR system from those that occur in a catalytic converter.[11] See Def.'s MSJ Ex. 4 at 23. Due to the similarities between a catalytic converter and the SCR system and the common use of the term "purify," the court classifies the SCR catalyst blocks as a part in the gas purifying SCR system under HTSUS heading 8421.

The court agrees with the government that the SCR catalyst blocks should be classified under heading 8421, HTSUS. The government further contends the SCR catalyst blocks are to be classified under subheading 8421.39.80, HTSUS, because the SCR catalyst blocks function as a gas filtering or purifying apparatus. Def.'s MSJ at 22. The court has a statutory mandate to "reach a correct result." Jarvis Clark Co., 733 F.2d at 878. As explained above, the court concludes that the SCR catalyst blocks are a part within the larger SCR system rather than an apparatus.

---

[11] The predominant chemical reaction in the SCR system facilitated by the SCR catalyst blocks involve ammonia as a necessary reactant. See Pl.'s MSJ at 2. The predominant chemical reaction in a catalytic converter does not involve ammonia as a reactant. See Emmy Kritsanayiparkporn et al., Catalytic Converters for Vehicle Exhaust: Fundamental Aspects and Technology Overview for Newcomers to the Field, 3 Chemistry 630, 632 (2021).

Therefore, the appropriate classification is subheading 8421.99.00, HTSUS – "Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof; parts; other."

## II.    The SCR Catalyst Blocks Cannot be Classified Under Heading 3815, HTSUS, Plaintiff's Claimed Classification

Both parties, at least initially, took a broad view of heading 3815, HTSUS, so that it would cover supported catalysts on a mesh. The language of the 301 exclusions reflects that view. The exclusions cover "[p]late-type supported catalysts . . . applied . . . to a stainless-steel mesh (described in statistical reporting number 3815.19.0000)." 9903.88.01, HTSUS; Exclusion Notice 1; Exclusion Notice 2. The government now contends that the court is not bound by Customs' previous views, that likely were reflected in the exclusion language, and that heading 3815, HTSUS, is not so broad as to cover supported catalysts extruded onto a mesh. Oral Argument at 37:35–39:00, 43:54–45:15. The court agrees.[12] In order to resolve this matter, however, the court need not reach the issue of what to do with the discrepancy between the description of the product excluded from 301 duties and the HTSUS classification assigned in the exclusions. The court proceeds by accepting <u>arguendo</u> that the 301 exclusion language is consistent with heading 3815, HTSUS, as originally accepted by the parties.

Mitsubishi, for its part, argues the SCR catalyst blocks are <u>prima facie</u> classifiable under heading 3815, HTSUS, because the blocks are described in whole under the heading as

---

[12] The language of the heading covers "[r]eaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included." Heading 3815, HTSUS. The EN to heading 3815 explains that it covers "preparations which initiate or accelerate certain chemical processes" and these preparations are often composed "of one or more active substances deposited on a support (known as 'supported catalysts')." EN 38.15. The "support" is not the mesh but the chemical support. <u>See</u> Def.'s SMF at ¶ 13. The support generally "consists of alumina, carbon, silica gel, siliceous fossil meal or ceramic materials." EN 38.15.

"preparations" that perform the functions of initiating and accelerating chemical reactions. Pl.'s Resp. at 23. The government counters that the SCR catalyst blocks are not covered by the plain language of heading 3815, HTSUS. Def.'s Reply at 11. For tariff classifications, an article is to be classified by "the condition in which it is imported." Rico Import Co. v. United States, 12 F.3d 1088, 1090 (Fed. Cir. 1993) (quoting Worthington v. Robbins, 139 U.S. 337, 341 (1891)). Here, the SCR catalyst blocks were imported fully formed. They were composed of supported catalysts and catalyst plates, but also, a protector, a set of seal bars, and a seal plate. Pl.'s MSJ at 18; Def.'s SMF at ¶¶ 7–8. SCR catalyst blocks are not supported catalyst chemical compounds alone, nor are they supported catalysts on a "medium," such as a mesh plate. Because, according to the uncontested facts, the SCR catalyst blocks are assemblies of all of these components, they exceed the scope of heading 3815, HTSUS, when interpreted according to the plain meaning of the terms of that heading and, especially, as clarified by EN 38.15. Therefore, they are excluded from heading 3815, HTSUS, by operation of GRI 1, HTSUS.

Further, SCR catalyst blocks cannot be classified under heading 3815, HTSUS, because it includes "not elsewhere specified or included" language. When interpreting if goods are prima facie classifiable under an HTSUS heading such as 3815 that includes the phrase "not elsewhere specified or included," the court must ensure that two criteria are met: (1) the goods must be described by the heading and (2) the goods must not be elsewhere specified or included in the HTSUS. See R.T. Foods, Inc. v. United States, 36 CIT 1637, 1644, 887 F. Supp. 2d 1351, 1358 (2012). Here, even if the court were to view heading 3815, HTSUS, extremely broadly, the SCR catalyst blocks cannot satisfy the second criteria because the SCR catalyst blocks are included under heading 8421.

     **a. The SCR Catalyst Blocks Cannot Be Classified Under Heading 3815, HTSUS, Using GRI 3(b)**

Mitsubishi further argues that because SCR catalyst blocks consist of different components, they are "composite goods" that should be classified by the component which gives them their essential character under GRI 3(b). Pl.'s MSJ at 18. Mitsubishi further explains that SCR supported catalysts "provide the essential functionality (i.e., imparts the essential character)" of the SCR catalyst blocks, and thus, the SCR catalyst blocks are "reaction initiators, reaction accelerators, and catalytic preparations" under heading 3815, HTSUS. Pl.'s MSJ at 18–20. The government counters that Mitsubishi is misapplying the GRIs by skipping to GRI 3 when the SCR catalyst blocks can be classified under heading 8421, HTSUS, using GRI 1. Def.'s MSJ at 24. The government is correct.

GRI 3 applies when "goods are, prima facie, classifiable under two or more headings." GRI 3, HTSUS. GRI 3(a) requires that:

> [t]he heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods . . . those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

GRI 3(a). GRI 3(b) requires that "composite goods consisting of different materials or made up of different components . . . shall be classified as if they consisted of the material or component which gives them their essential character." GRI 3(b). As previously noted, however, the court uses the GRIs in numerical order and only moves to the next GRI if the classification cannot be made by the previous GRI. See Wilton Indus., 741 F.3d at 1266. Because the SCR catalyst blocks are classified under heading 8421, HTSUS, per GRI 1 the court cannot move to GRI 3, as Mitsubishi's suggested classification requires. Further, even if the court could move beyond GRI

1, the product cannot be classified under any heading other than 8421, so there is no need to consider which heading provides the essential character.

### III.    The Doctrine of Equitable Estoppel Does Not Apply

Mitsubishi argues that the doctrine of equitable estoppel requires a finding that the Section 301 exclusions apply to the SCR catalyst blocks regardless of their HTSUS heading classification. Pl.'s MSJ at 28; Oral Argument at 31:29.  Mitsubishi explains that it specifically sought the exclusions for the subject merchandise that the USTR later granted, and it relied on these granted exclusions to its detriment.  Oral Argument at 31:33; see Pl.'s MSJ Ex. 10, 11.  Additionally, Mitsubishi argues that the USTR's granting of the exclusions gave Mitsubishi no notice that it would be required to pay duties on the SCR catalyst blocks when imported.  Pl.'s Resp. at 40.  The government argues that Mitsubishi has not carried its burden of proving equitable estoppel because Mitsubishi has not pointed to any affirmative government misconduct by Customs.  Oral Argument at 48:40.  The government further asserts that Mitsubishi could have tried to work with the USTR to edit the language of the exclusions if it thought the USTR erred in its drafting.  Oral Argument at 39:45, 42:20.

The court concludes that Mitsubishi was on notice that its request was only partially granted and that its products were not covered by the language of the exclusions drafted by the USTR.  The USTR's letters to Mitsubishi granting specific exclusions provided a link to its proposed exclusion language and noted:

> An exclusion in response to your request has been granted by excluding from the additional tariffs products covered by a specially drafted description contained in the annex to the exclusion notice. The scope of the exclusion is governed by the scope of the 10-digit HTSUS subheadings and product descriptions in the annex to the product exclusion notice, and not by the product descriptions set out in any particular request for exclusion.

Pl.'s MSJ Ex. 10 at 12, Ex. 11 at 12 (emphasis added).  When Mitsubishi applied for the exclusions,

it described the subject merchandise but did not provide the USTR with specific language to use in the exclusions. See Pl.'s MSJ Ex. 10, 12. As noted in its letter, the USTR drafted the exclusions in response to Mitsubishi's request, but the ultimate application of the exclusions to the specific merchandise is governed by the language of the exclusions, not by the description of the merchandise in the exclusion requests. See Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 85 Fed. Reg. at 27489-02, 27490; Notice of Product Exclusion Extension: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 85 Fed. Reg. at 48600-01, 48601. Both exclusions issued by the USTR made no mention of the other components of the imported merchandise. The exclusions only mention "[p]late-type supported catalysts . . . applied . . . to a stainless-steel mesh." Exclusion Notice 1; Exclusion Notice 2. The language of the exclusions comport with the parties' initial positions that supported catalysts on a mesh plate are classifiable under heading 3815, HTSUS. As indicated, although the court concludes that the description of the product in the exclusions and the noted classification do not agree, it does not change the outcome of this case. Supported catalysts on a mesh plate may be excluded from 301 duties, but the product at issue is more than that. It is an entire assembly of various parts of which the mesh plates are only one component. Nothing occurred here that is inconsistent with the exclusions granted. The government did not mislead plaintiff.

## CONCLUSION

For the foregoing reasons, the court denies both Mitsubishi's motion for summary judgment and the government's cross-motion for summary judgment. The subject merchandise is properly classified under subheading 8421.99.00 and secondary heading 9903.88.01, HTSUS. Judgment will be entered accordingly.

Court No. 21-00573                                                      Page 19

                                                          /s/ Jane A. Restani
                                                         Jane A. Restani, Judge

Dated: April 29, 2025
       New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| MITSUBISHI POWER AMERICAS, INC., |
| Plaintiff, |
| v. |
| UNITED STATES, |
| Defendant. |

Before: Jane A. Restani, Judge

Court No. 21-00573

## <u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision:

Judgment is hereby issued declaring that the entries before the court are classified under heading 8421.99.00, HTSUS.

  /s/ Jane A. Restani
Jane A. Restani, Judge

Dated: April 29, 2025
       New York, New York